UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X
ROBERT DEREK LURCH JR.,

                            Plaintiff,

        -against-

                                                                **REPORT AND**
                                                                **RECOMMENDATION**
KEVIN MENENDEZ, DAVID SMITH,                                     19-CV-6011 (DG) (TAM)
MIKOLA MAHARSKYY, VINCENT
PIRA, XAVIER GALLOZA, JONATHAN
McGIBBON, KARL HANISCH, and
TREYMANE CRAIGG,

                            Defendants.
----------------------------------------------------------X

**TARYN A. MERKL**, United States Magistrate Judge:

        Almost five years ago, Plaintiff brought this case, alleging that multiple people

who interacted with him after he started a fight in a bodega violated his rights. (*See*

Compl., ECF No. 2.) Following the incident in the bodega, numerous NYPD personnel

responded to the scene, and Plaintiff was handcuffed and ultimately placed under

arrest. The Court now considers Defendants' motion for summary judgment as to all of

Plaintiff's remaining claims, which are supported only by Plaintiff's assertions that

Officer Menendez and a female civilian assaulted him while he was handcuffed, and the

other officers on the scene failed to intervene or protect him. (Second Am. Compl.

("SAC"), ECF No. 69, at 6–10; Defs. Mot. for Summ. J. ("Defs. Mot."), ECF No. 210; Defs.

Mem. in Supp. of Mot. for Summ. J. ("Defs. Mem."), ECF No. 213.) Defendants argue

that Plaintiff fabricated the incident, that he has provided no credible evidence that the

assaults occurred, and that no reasonable jury could conclude the alleged constitutional

violations took place. (Defs. Mem., ECF No. 213.)

After carefully reviewing the summary judgment record and analyzing all evidence in the light most favorable to the non-movant, the Court finds that no reasonable jury could return a verdict for Plaintiff in this case; there is no material fact in dispute. As detailed herein, the summary judgment record in this case includes video evidence documenting Plaintiff's statements after he was handcuffed. That video evidence, taken together with all of the deposition testimony in the case and documentary evidence, illustrates that Plaintiff was injured during a fight with the bodega workers and then, while handcuffed and detained, told Officer Menendez that he was going to sue Officer Menendez for his injuries. Remarkably, the video shows Plaintiff, a prolific federal litigant, theorizing about different lawsuits he could bring against various people based on the events of the evening and providing various explanations of what happened. None of his statements from the night of the incident, however, support his current claim that Officer Menendez and a woman assaulted him while other officers looked on. To the contrary, the video evidence significantly undercuts Plaintiff's current version of events. At the same time, the video evidence strongly supports Defendants' version of the events, which is further supported by the documentary evidence and medical records in the case. Accordingly, notwithstanding Plaintiff's claim that Officer Menendez assaulted him and assisted in the woman's assault of him, the Court finds that Plaintiff's conclusory account is not supported by any evidence other than his own contradictory and inconsistent statements and that no reasonable juror could find that the alleged constitutional violations occurred as claimed. The Court therefore recommends granting summary judgment to Defendants.

**PROCEDURAL HISTORY**

On October 10, 2019, Plaintiff, proceeding *pro se*, filed this lawsuit, seeking damages after he sustained injuries in a fight at a bodega on or about the evening of

August 16, and into the early morning hours of August 17, 2019, in Brooklyn. (*See* Compl., ECF No. 2; Am. Compl., ECF No. 4.) In the complaint, he named the City of New York, a range of police offers, the bodega owner and employees, and his treating physician as Defendants. (Am. Compl., ECF No. 4, at ECF p. 4.)

On December 12, 2019, the Honorable Ann M. Donnelly dismissed claims against all Defendants other than John Doe Officer M. (Mem. & Order, ECF No. 9.) On May 10, 2021, after the City identified him as the relevant officer, Defendant Menendez answered the complaint. (Letter, ECF No. 28; Answer, ECF No. 49.) In the meantime, on December 16, 2020, the case was reassigned from Judge Donnelly to the Honorable Diane Gujarati. (Dec. 16, 2020 ECF Notice of Reassignment.) On August 18, 2021, and October 14, 2021, Defendant moved to dismiss for failure to prosecute. (Letter Mot. to Dismiss, ECF No. 54; Letter Mot., ECF No. 55.) On November 22, 2021, Judge Gujarati referred the first motion to dismiss to the Honorable Sanket J. Bulsara. (Nov. 22, 2021 ECF Order Referring Mot.) On December 9, 2021, Judge Bulsara recommended denying Defendant's motion to dismiss for failure to prosecute, which recommendation Judge Gujarati adopted. (R. & R., ECF No. 58; Mem. & Order Adopting R. & R., ECF No. 71.)

On February 8, 2022, Plaintiff filed a second amended complaint, alleging that Officer Menendez and newly added Defendants Lieutenant David Smith, Officers Mikola Maharskyy, Vincent Pira, Xavier Galloza, Jonathan McGibbon, Karl Hanisch, and Sergeant Treymane Craigg violated his constitutional rights, alleging excessive force, failure to protect, and failure to intervene claims. (SAC, ECF No. 69.) On March 1, 2022, Defendant Menendez answered the second amended complaint. (Answer, ECF No. 72.) On May 10, 2022, Judge Bulsara issued an order directing the City to provide the service addresses for the new Defendants or to agree to accept service on their behalf. (May 10, 2022 ECF Order (citing *Valentin v. Dinkins*, 121 F.3d 72 (2d Cir. 1997)).)

On June 30, 2022, the Clerk of Court issued amended summons as to Police Officer Jonathan McGibbon, Police Officer Vincent Pira, Police Officer David Smith, and Police Officer Xavier Galloza. (Amended Summons, ECF No. 96.) On August 23, 2022, the Clerk of Court issued summons as to Police Officer Maharskyy, Sergeant Hanisch, and Sergeant Craigg, all of which were returned executed. (Second Amended Summons, ECF No. 105.) Following their being served, additional answers were filed on behalf of McGibbon, Pira, Maharskyy, Hanisch, and Craigg. (Answer, ECF No. 107; Answer, ECF No. 124.)[1]

Defendants served Plaintiff with their motion for summary judgment on October 21, 2024. (Letter, ECF No. 203; Aff. of Service, ECF No. 204.) On November 18, 2024, Defendants filed a motion for summary judgment, a Rule 56.1 statement, and supporting documents with the Court. (Defs. Mot., ECF No. 210; Decl. in Supp., ECF No. 211; Rule 56.1 Statement ("Defs. 56.1"), ECF No. 212; Defs. Mem., ECF No. 213.) Plaintiff filed his responses and his 56.1 statement on November 5, 2024. (Pl. Opp'n to Defs. 56.1 ("Pl. 56.1"), ECF No. 206; Pl. Opp'n to Defs. Mot. ("Pl. Opp'n"), ECF No. 207; Pl. Decl. in Opp'n, ECF No. 208 (dated November 5, 2024).) With the Court's permission, Plaintiff subsequently filed additional documents in support of his claim.

---

[1] The summons issued for Officer Smith was returned unexecuted; the City requested additional information given the officer's common name. (Summons Returned Unexecuted, ECF No. 101.) The summons as to Officer Galloza was returned unexecuted because he no longer worked for the NYPD. (Summons Returned Unexecuted, ECF No. 103.) The remaining June 30, 2022 summons were returned executed. (Amended Summons Returned, ECF Nos. 102, 104.) The August 23, 2022 summons were all returned executed. (Second Amended Summons Returned, ECF Nos. 113, 114, 115.)

The Court notes that Officer Galloza and the individual first identified as Officer David Smith (who the Court now understands to be Lieutenant David Smith) do not appear to have been properly served. Accordingly, Galloza and David Smith have not formally appeared in this case and the Court lacks jurisdiction over them. Nonetheless, the Court recommends that the claims against them be dismissed for the reasons discussed herein.

(Contentions in Supp. ("Pl. Record"), ECF No. 218.) Defendants filed their reply on November 18, 2024, along with an affidavit and excerpts of Plaintiff's deposition transcript. (Reply, ECF No. 215; Second Decl. in Supp., ECF No. 216; Pl. Dep., ECF No. 216-1.) On December 16, 2024, Judge Gujarati referred the motion to Judge Bulsara for a Report & Recommendation. (Dec. 16, 2024 ECF Order Referring Mot.) On December 23, 2024, the case was reassigned to the undersigned Magistrate Judge. (Dec. 23, 2024 ECF Case Reassignment.) On January 21, 2025, Defendants confirmed that the motion was fully briefed. (*See* Letter, ECF No. 220.)[2]

## FACTUAL BACKGROUND

On August 17, 2019, at about 1:34 a.m., Plaintiff walked into a bodega, "began to act aggressive, spat at the bodega workers, and threw items off the counter and shelves." (Defs. 56.1, ECF No. 212, ¶ 1 (citing Surveillance Footage from 1961 Fulton Street, Brooklyn, New York 11223 ("Bodega Footage"), ECF No. 211-1, at 00:00–1:07, and Pl. Dep., ECF No. 211-2, at 38:9–39:13); Pl. 56.1, ECF No. 206, ¶ 1.)[3] In response, two people working at the bodega grabbed a wooden stick and a metal bat and "hit plaintiff repeatedly in the head and body." (Defs. 56.1, ECF No. 212, ¶ 2 (citing Bodega Footage at 00:00–1:07, and Pl. Dep., ECF No. 211-2, at 41:1–44:9); *see also* Pl. Record, ECF No. 218,

---

[2] On April 17, 2025, Plaintiff filed a supplemental submission related to the summary judgment motion. (Pl. Add'l Contentions, ECF No. 221.)

[3] Plaintiff's 56.1 statement does not affirmatively agree or disagree with many statements Defendants make, and where he disagrees, he cites no evidence to support his claim that the fact is in dispute. (*See* Pl. 56.1, ECF No. 206.) Defendants argue that Plaintiff thus admits that all of these facts are not in dispute. (*See* Reply, ECF No. 215, at 2–3.) In recognition of the leniency typically granted to *pro se* plaintiffs, the Court declines to deem all facts in Defendants' 56.1 statement undisputed; instead, the Court considers Plaintiff's denials in tandem with his evidentiary submissions where applicable throughout. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006); *Vartholomeou v. City of New York*, No. 15-CV-4996 (PKC) (LB), 2018 WL 11466965, at *4 (E.D.N.Y. Jan. 2, 2018), *report and recommendation adopted*, Mar. 5, 2018 ECF Order Adopting R. & R. (*See generally* Pl. Record, ECF No. 218.)

at ECF pp. 44–55 (including NYPD forms related to bodega employees' use of a bat and stick on Plaintiff); Pl. 56.1, ECF No. 206, ¶ 2.) While the fight was occurring, "one of the bodega workers ran outside and waved down non-party NYPD Lieutenant Caviness and his driver, NYPD Officer [Kenyon] Smith, and stated that there was a male inside destroying the bodega." (Defs. 56.1, ECF No. 212, ¶ 3 (citing Caviness Dep., ECF No. 211-3, at 32:5–21).) Caviness and Smith "went inside the bodega, witnessed plaintiff pull down a rack, and put him in handcuffs." (*Id.* ¶ 4 (citing Caviness Dep., ECF No. 211-3, at 34:15–22).)[4] At around 1:47 a.m., someone from the police department requested additional NYPD assistance at that location. (Menendez Decl., ECF No. 218, at ECF p. 15, Decl. ¶ 7.) Officers Menendez, Pira, McGibbon, Hanisch, and Craigg arrived on the scene after Plaintiff was handcuffed. (Defs. 56.1, ECF No. 212, ¶ 5 (citing Menendez Dep., ECF No. 211-4, at 80:14–81:7; Menendez BWC 1, ECF No. 211-5, at 0:00–1:00; Menendez BWC 2, ECF No. 211-6, at 1:50–2:30).)[5] Menendez testified that he activated his body worn camera within a minute of arriving on the scene. (Defs. 56.1, ECF No. 212, ¶ 6 (citing Menendez Dep., ECF No. 211-3, at 152:7–153:11).)

There are three videos in the summary judgment record. The first video, from the bodega's surveillance footage, shows portions of the fight between Plaintiff and the bodega workers. (*See* Bodega Footage, ECF No. 211-1.) The second video starts by showing Plaintiff sitting on a bench with police officers standing around him as he

---

[4] Officer Menendez also stated under penalty of perjury that someone called 911 at approximately 1:35 a.m. from "the vicinity of 1961 Fulton Street, Brooklyn, NY," and fighting was audible in the background. (Menendez Decl., ECF No. 218, at ECF pp. 14–15, ¶ 5.)

[5] Menendez testified at his deposition that when he arrived, Lieutenant Caviness, Officer Smith, and Officer McGibbon were already on the scene. (Menendez Dep., ECF No. 218, at ECF p. 549, at 106:23–109:2.) Menendez also testified that Plaintiff was already handcuffed. (*Id.* at ECF p. 550, at 110:12–14.)

interacts with and talks to Officer Menendez; after a few minutes, EMTs arrive and take Plaintiff into an ambulance. (*See* Menendez BWC 1, ECF No. 211-5.) The third video shows Plaintiff in the ambulance on the way to the hospital. (*See* Menendez BWC 2, ECF No. 211-6.) In addition, there are various documents and depositions transcripts in the record, as discussed more fully below.[6]

## I.  Video Evidence

### A.  The Bodega Surveillance Footage

The bodega surveillance footage, which does not include sound, spans a little over one minute. (*See* Bodega Footage, ECF No. 211-5.) The footage shows Plaintiff entering the bodega and pushing items onto the floor, followed by a fight with the bodega workers, who hit Plaintiff repeatedly with a bat and a wooden stick. (*Id*.) The video does not show the end of the fight or Plaintiff's arrest.

At the beginning of the video, Plaintiff walks in and stands in front of a counter, and a woman walks in and stands away from him. (*Id.* at 00:00–00:08.) Plaintiff then starts throwing merchandise onto the ground and he appears to spit at the bodega workers. (*Id.* at 00:08–00:24.) From the other side of the counter, one bodega worker grabs a bat, and then the other grabs a stick, and the two begin to gesture as though they are trying to hit Plaintiff, all from behind the counter. (*Id*. at 00:11–30.) Plaintiff backs away and throws more merchandise onto the floor from the bodega's shelves. (*Id.* at 00:30–00:38.) Plaintiff then appears to follow one of the workers through a door and

---

[6] Separately, Plaintiff filed a 611-page document in support of his opposition, primarily containing NYPD arrest records, sections of the NYPD's patrol guide, property vouchers, and hundreds of pages of deposition testimony. (*See generally* Pl. Record, ECF No. 218.) After briefing was closed, Plaintiff also submitted a supplemental document providing objections with citations to documents within the summary judgment record. (*See* Pl. Add'l Contentions, ECF No. 221.)

disappears from the frame briefly. (*Id*. at 00:38–00:44.) A few seconds later, he reappears, pushing one of the bodega workers backwards and onto the floor, while from behind, the second bodega worker hits Plaintiff repeatedly with a wooden stick. (*Id*. at 00:44–00:56.) At this point, the woman begins reaching for the wooden stick. (*Id*. at 00:54–1:07.) The first bodega worker gets up off the floor and ducks while Plaintiff punches him in and around his head, and then the worker starts hitting Plaintiff with a silver baseball bat. (*Id*. at 00:51–01:04.) The altercation moves off-screen, and the video ends. (*Id.* at 1:04–1:07.)

## B.  Officer Menendez's First Body Camera Video (from the sidewalk)

Menendez's body worn camera footage begins on the sidewalk, nearby to the bodega, at 1:53:03.[7] (Menendez BWC 1, ECF No. 211-5, at 00:00.)[8] When the footage starts, Lurch is not clearly discernible, and the scene depicts officers standing around on the sidewalk. The audio starts at 1:53:33, mid-conversation; it depicts Officer Kenyon

_____

[7] The time stamp indicates that the time is marked in GMT-4, which equates to Eastern Daylight Time. The Court notes that the citations used herein refer to the running time for the video clip itself, not the time stamp. The Court also notes that the audio on the body worn camera recordings starts 30 seconds into the video clips, which, according to all of the officers who were deposed regarding the body cameras, was standard. When they activated their body cameras, the video picked up 30 seconds before the camera was activated, but the audio only begins when the camera is activated. (*See, e.g.*, Craigg Dep., ECF No. 218, at ECF p. 399, at 96:19–97:9; Jean-Baptiste Dep., ECF No. 218, at ECF pp. 489–90, at 115:13–20, 117:24–118:4; Menendez Dep., ECF No. 218, at ECF p. 564, at 166:7–12.)

[8] Menendez indicated in a sworn declaration prepared in connection with this case that he received a radio-run dispatch directing him to the location of the incident at approximately 1:47 a.m., six minutes before he activated his body camera. (Menendez Decl., ECF No. 218, at ECF p. 15, ¶ 13; *see also* Menendez BWC 1, ECF No. 211-5, at 00:00 (showing timestamp of body camera video as 1:53:03).) There was a separate 911 call at 1:35 a.m., but Menendez was not dispatched to respond at that time. (Menendez Decl., ECF No. 218, at ECF pp. 14–15, ¶¶ 5–6.) Menendez stated that he did not delete any body worn camera footage and does not have the capacity to do so. (*Id*. ¶¶ 14–15.) Plaintiff does not squarely argue, in opposition to summary judgment, that Menendez was lying about when he started his body camera footage, but he does assert (without citing to any evidence in support) that the officers all turned on their cameras when instructed to do so by Lieutenant Caviness. (*See generally* Pl. 56.1, ECF No. 206; Pl. Opp'n, ECF No. 207; Pl. Decl. in Opp'n, ECF No. 208.)

Smith speaking with Plaintiff, who exclaims, "Bro, I'm dead ass serious man," in response to which Smith says, "she got your phone?" (*Id.* at 00:30–33.) Plaintiff responds, "Yeah, she got my phone." (*Id.* at 00:33–00:35.) Plaintiff proceeds to tell the officers: "I just gave her $500 this week" and "now she's trying to get me locked up." (*Id.* at 00:55–1:03.) Plaintiff further related that "she told me to go back . . . and holler at him," and then stated they "pulled a bat on me and started hitting me with a bat." (*Id.* at 1:04–1:10; *see also* Defs. 56.1, ECF No. 212, ¶ 7 (citing Menendez BWC 1, ECF No. 211-5, at 00:58–1:12).) Then, approximately one minute into the video, the frame of Menendez's body worn camera becomes obscured, due to Plaintiff having stood up, and Plaintiff loudly exclaims: "Why is you touching me?" (Menendez BWC 1, ECF No. 211-5, at 1:10–1:13.) The video makes clear that Menendez then proceeded to hold Plaintiff's arm with a gloved hand until Plaintiff sat back down after the EMTs arrived. (*Id.* at 1:14–4:38.)

Upon standing up and exclaiming "Why is you touching me?," Plaintiff's demeanor shifts. (Menendez BWC 1, ECF No. 211-5, at 1:10–1:13.) At that point, Plaintiff raises his voice and asks Menendez how much Menendez will pay him, asking if Menendez wants to be part of a lawsuit, and telling Menendez he won money in a lawsuit recently. (Defs. 56.1, ECF No. 212, ¶ 8 (citing Menendez BWC 1, ECF No. 211-5, at 01:24–2:10); Pl. 56.1, ECF No. 206, ¶ 8 (agreeing that this occurred as stated in Defs. 56.1).) As depicted on the body worn camera, Plaintiff states:

> "How much you goin' to pay me? You know I am suing the city of New York right now, right? How much you going' to pay me? Huh? [] 19-CV-4350. 18-CV-9592.[9] Do you want to be part of a civil

---

[9] The Court takes judicial notice that these two docket numbers refer to cases initiated by Plaintiff in the Southern District of New York, *Lurch v. City of New York*, No. 19-CV-4350 (PAE) (JLC) (S.D.N.Y.), and *Lurch v. Sergeant One*, No. 18-CV-9592 (NSR) (S.D.N.Y.).

lawsuit, boy? That's what I'm asking you. I just got paid $65,000 on January 29. Do you want to be part? I'm asking you boy . . . $20,000. You wanna go more? Do you wanna go more?"

(Defs. 56.1, ECF No. 212, ¶ 8 (quoting Menendez BWC 1, ECF No. 211-5, at 01:24–2:10).)

Throughout this exchange, Menendez repeatedly tells Plaintiff to relax and sit down.

(*See* Menendez BWC 1, ECF No. 211-5, at 01:24–2:10.) Plaintiff then says: "I'm asking

you, Menendez, 'cuz I know your name. No officer is touching me. What other officer is

touching me? So why are you touching, why are you touching me?" (*Id.* at 2:03–13.) In

response, Menendez says: "Brother, if you sit down and relax, I wouldn't have to touch

you." (*Id.* at 2:14–17.)

Shortly thereafter, Plaintiff, Menendez and one or more other NYPD officers

engaged in the following exchange:

> Plaintiff: "Lacerations to the head. Menendez caused it. Bomb."
> Officer: "You just said you got beat up by a bat."
> Plaintiff: "No I didn't get beat up by nothing, who told you that? I got beat up by Menendez."
> Other officer: "Don't you know we all got cameras on?"
> Plaintiff: "What you talking about I don't care. Who got cameras? Who got cameras?"
> Other officer: "Everybody!"
> Plaintiff: "So what? Menendez beat me up."
> Officer Menendez: "But my camera has been on for a couple minutes already."
> Plaintiff: "So what? Yeah you hit me."
> Menendez: "And it got you mentioning that you got beat up by a bat so where are we going with this?"
> Plaintiff: "Who said that? Who said I did?"
> Menendez: "You did. My camera says you did."
> Plaintiff: "Well I ain't never said that."
> Other officer: "You did. You said you came in the store and they pulled out a bat on you."
> Plaintiff: "I never said that. He pulled out a bat on me then Menendez beat me up."
> Menendez: "Alright, man."
> Plaintiff: "You laughing, bro. Keep laughing, bro. You goin' to see who laughing bro. I always laughing at the end of the day . . . I got beat up with a bat. I'm bleeding and you touching me."

(Defs. 56.1, ECF No. 212, ¶ 9 (quoting Menendez BWC 1, ECF No. 211-5, at 02:28–3:15); *see also* Pl. 56.1, ECF No. 206, ¶ 9 (not denying that this occurred as set forth in Defs. 56.1).) During this exchange, Menendez again told Plaintiff that if he would sit down, Menendez could stop touching him. (Menendez BWC 1, ECF No. 211-5, at 03:10–3:14 (Menendez stating: "If you sit down, I'm not going to touch you, man.").)

At around 1:57 a.m., EMTs arrived, and Plaintiff sat back down on the bench. (Defs. 56.1, ECF No. 212, ¶ 10; Menendez BWC 1, ECF No. 211-5, at 04:37.) When asked by an EMT what was going on, Plaintiff stated: "'Officer Menendez and the officers in the store hit me. Matter of fact, you know what Menendez, you good.'" (Defs. 56.1, ECF No. 212, ¶ 11 (quoting Menendez BWC 1, ECF No. 211-5, at 4:30–4:50).) An EMT then asked Plaintiff: "What happened tonight?" (Menendez BWC 1, ECF No. 211-5, at 4:56–4:57.) In response, Plaintiff stated: "I went in the store, they robbed me for my bag, and then when I asked them for my bag, they started hitting me with a bat." (*Id.* at 4:58–5:07.) Plaintiff was then escorted into the ambulance by Officer Menendez and the EMTs. (Defs. 56.1, ECF No. 212, ¶ 14 (quoting Menendez BWC 1, ECF No. 211-5, at 7:50–8:30).) As the EMT led Plaintiff to the ambulance, Plaintiff turned to Menendez and said, among other things, "I got beat up. I could've blamed this all on you." Menendez responds, "Thankfully we got body cameras now, so." Plaintiff replies, "Thankfully y'all got body cameras. Thankfully." (Menendez BWC 1, ECF No. 211-5, at 8:02–8:12.) Nothing in the body camera videos in the record depicts assault or use of excessive force of any kind.

### C. Officer Menendez's Second Body Camera Video (from inside the ambulance)

The third video starts with Menendez standing outside and then entering the rear doors of the ambulance; it then depicts Plaintiff in the ambulance talking to

Menendez (and briefly to Officer Smith) and the EMTs. (Menendez BWC 2, ECF No. 211-6.) Shortly after the audio starts, Plaintiff asks: "You're just making sure I get there, right?," to which Menendez replies in the affirmative, and then the video shows Plaintiff interacting with Officer Smith, who is leaning into a side door of the ambulance. (*Id.* at 00:32–00:54.) Officer Smith then asks Menendez whether he is going to "Kings County," to which Menendez says "KCH," and then Smith tells Menendez: "grab my cuffs for me." (*Id.* at 0:55–0:58.) Smith then tells Plaintiff: "you gotta be calm man. You acted like a jackass . . . I know why. I don't know where she came from, but, you acted like a jackass." (*Id.* at 1:01–1:08.) In response, Plaintiff says: "Yo, she my girl on the low, like, she started talking to another dude, and she tryin' to replace me, now she's tryin' to get me locked up, I appreciate you. I see where it's all coming from now," in response to which Smith told Plaintiff that he has to calm down. (*Id.* at 1:08–1:22.) Plaintiff then stated: "Yo, bro, I'm calm, bro. Thank you, bro." (*Id.* at 1:22–1:26.)

Plaintiff and Menendez then chatted in the ambulance, with Plaintiff asking Menendez to remove his handcuffs, to which Menendez stated: "I can't take them off just yet, not yet. Especially not in an ambulance. We gotta get to the hospital. I don't even know what they're doing with this. You hear me? Like I showed up, you were already in handcuffs, you were bleeding, I had no idea what was going on." (*Id.* at 1:34–1:59.) Plaintiff responds:

> I understand, I understand that, brother. What happened was, I pulled up to store, they took my bag, so I asked them for my bag, they said get out of the store. . . . Started swinging a bat at me. They swing a bat at me, I called my girl, told her someone swung a bat at me, she said, "go to the store, go to the store, they swung a bat at you, you a man." I go to the store, I say, "Why you all swing a bat at me?" "Fuck outta here, we're going to beat you up!" I said, "What?" So I threw something down . . . I say: "Yo, y'all hit me for no reason." Then, they came out, they start hitting me again, everything on camera.

(*Id.* at 1:57–2:30.) Plaintiff then mentioned the possibility of a lawsuit against the bodega workers, stating, among other things: "Just for the lawsuit I'm talking up . . . Yeah yeah they hit me numerous times with a bat. This not for you, officer." (Defs. 56.1, ECF No. 212, ¶ 16 (quoting Menendez BWC 2, ECF No. 211-6, at 4:00–4:20); *see also id.* ¶¶ 17–19 (excerpting further statements by Plaintiff concerning whether he could bring a lawsuit against the bodega workers, e.g., "But it's a lawsuit, right? If somebody hit me first, right?").)

Threaded throughout Plaintiff's statements on the body worn camera footage are various statements by Plaintiff regarding what happened with a woman that night, who Plaintiff identified as Chantel. (*See* Defs. 56.1, ECF No. 212, ¶ 20.) At no point on the body worn camera footage did Plaintiff say that Chantel had assaulted him. (*See* Defs. 56.1, ECF No. 212, ¶ 20; *but see* Pl. 56.1, ECF No. 206, ¶ 20 (citing no evidence, but stating that Plaintiff "informed P.O. Mcduffie that the female citizen assaulted").) Consistent with Plaintiff's initial recap to Menendez of what had happened before Menendez arrived at the scene, later on during the ride to the ambulance, Plaintiff continued:

> The only reason why this happened is because my girl told me go back somewhere, and I told her that I'm not goin'. And then when I go back, she tell officers at that, at — she tell them "yo, stop hittin' him" after they hittin' me with wooden sticks and all of that. Then she tell officers, "lock him up, he's harassing me." But, really? I bought her a phone and she mad 'cuz I'm calling her while she with her boyfriend. After I bought her a phone. She met somebody after I bought her a phone. They met. And trying to get me locked up so I won't call her no more.

(Menendez BWC 2, ECF No. 211-6, at 12:43–13:15.) Plaintiff goes on to discuss his relationship with Menendez and to lament the difficulty of walking away from someone you love. (*Id.* at 13:25–14:50.)

## II. Deposition Testimony

Both parties have submitted deposition testimony as part of the summary judgment record.[10] The depositions, taken together, establish that on the night of Plaintiff's arrest, personnel from two different NYPD police units responded to the scene, including a lieutenant and officers from a Police Service Area unit ("PSA 2") that was responsible for covering certain NYCHA housing in Brooklyn, as well as a lieutenant and officers from the 81st Precinct, which was responsible for policing a geographic area in Brooklyn.

The depositions establish that Lieutenant Caviness, the PSA 2, or housing, lieutenant, was one of the first two police personnel who responded to the incident at the bodega, after the bodega workers flagged his car down, and that Caviness

_____

[10] The deposition transcripts Plaintiff submitted include the depositions of Lieutenant Aluthea Caviness, Officer Mina Tadros, Officer Mikola Maharskyy, Officer Gregory Lapin, Lieutenant David Smith, Sergeant Joseph Mulé, Officer Jonathan McGibbon, Officer Kenyon Smith, Officer Vincent Pira, Sergeant Karl Hanisch, Sergeant Tremayne Craigg, Officer Xavier Galloza, Officer Schedler Jean-Baptiste, and Officer Kevin Menendez. (*See* Caviness Deps., ECF No. 218, at ECF pp. 56–104 (including deposition transcripts from September 28, 2023, and November 1, 2023); Tadros Deps., ECF No. 218, at ECF pp. 106–146 (including deposition transcripts from September 20, 2023, and October 27, 2023); Maharskyy Dep., ECF No. 218, at ECF pp. 147–167 (May 1, 2023 deposition); Lapin Dep., ECF No. 218, at ECF pp. 169–207 (May 23, 2023 deposition); David Smith Dep., ECF No. 218, at ECF pp. 209–232 (July 24, 2023 deposition); Mulé Dep., ECF No. 218, at ECF pp. 234–239 (October 4, 2023 deposition; testifying about NYPD bodyworn camera policies that were in effect in 2019, and stating that officers were expected to activate their cameras prior to engaging with anyone, including "speaking with anyone or taking any type of police action" (*id.* at ECF p. 234, at 32:12–21), in the absence of exigent circumstances, which could include an assault with a bat (*id.* at ECF p. 236, at 39:22–40:6), but which would not include a situation where a suspect was already in custody (*id.* at ECF p. 36, at 40:8–13)); McGibbon Dep., ECF No. 218, at ECF pp. 241–260 (June 1, 2023 deposition); Kenyon Smith Dep., ECF No. 218, at ECF pp. 262–263 (including excerpted deposition transcript from September 29, 2023, in which Officer Smith testified that he had suffered a stroke and undergone brain surgery nine months and one day prior to his deposition, and was suffering from a diminished memory); Pira Dep., ECF No. 218, at ECF pp. 269–311 (June 9, 2023 deposition); Hanisch Dep., ECF No. 218, at ECF pp. 313–373 (June 13, 2023 deposition); Craigg Dep., ECF No. 218, at ECF pp. 375–422 (June 6, 2023 deposition); Galloza Dep., ECF No. 218, at ECF pp. 424–458 (August 23, 2023 deposition); Jean-Baptiste Dep., ECF No. 218, at ECF pp. 460–520 (April 20, 2023 deposition); Menendez Dep., ECF No. 218, at ECF pp. 522–611 (July 27, 2023 deposition).)

supervised Plaintiff's arrest. (*See* Defs. 56.1, ECF No. 212, ¶ 4 ("Lieutenant Caviness and Officer Smith went inside the bodega, witnessed plaintiff pull down a rack, and put him in handcuffs."[11] (citing Caviness Dep., ECF No. 211-3, at 34:15–22)); *see* Caviness Dep., ECF No. 218, at ECF p. 64, at 33:2–14 (stating that Smith put Plaintiff in handcuffs[12]).) During his deposition, Caviness testified that Officer Smith placed Plaintiff in handcuffs, and that he helped Smith do so. (Caviness Dep., ECF No. 218, at ECF p. 62, at 25:1–19; *id.* at ECF p. 65, at 34:19–22, 35:1–12.)

Caviness also testified that his recollection of the incident was limited and that he had no recollection of Plaintiff from anything other than watching the video of the incident; his testimony does not clearly establish when Menendez arrived on scene or what Menendez's role was in detaining Plaintiff. (*See, e.g.*, *id.* at ECF p. 65, at 35:4–9, 19–

---

[11] Plaintiff states that Officer Menendez arrested him at Caviness's direction outside of the bodega "after a name check came back not showing any results." (Pl. 56.1, ECF No. 206, ¶ 4.) Plaintiff cites no evidence in support of this assertion. The Court also notes that this claimed fact is in sharp conflict with Plaintiff's contemporaneously recorded statements on the body worn camera footage, which shows Officer Menendez asking Plaintiff his name, over 20 minutes after Menendez's initial bodycam footage starts, to which Plaintiff responded by providing a fake name: Jeremy Williams. (Menendez BWC 2, ECF No. 211-6, at 1:43–1:46 (time stamp 2:16 a.m.).)

[12] Plaintiff has made many arguments concerning the identity of the arresting officer, which are ultimately irrelevant for the reasons discussed below. Part of the dispute appears to be a semantic one. As the depositions make clear, the arresting officer, in NYPD parlance, is not necessarily the officer who places handcuffs on an individual who has been detained, but is, rather, the "uniformed member of the service who was processing the paperwork and would ultimately sign the complaint with the district attorney's office." (Mulé Dep., ECF No. 218, at ECF p. 238, at 49:10–13; *see also* Pira Dep., ECF No. 218, at ECF p. 281, at 48:5–49:19 (discussing the difference between handcuffing someone and completing arrest processing).) The Court notes, however, that all of the evidence, taken together, strongly corroborates Caviness's account that Officer Smith was the individual who placed handcuffs on Plaintiff. As discussed below, the majority of the officers who arrived at the scene after Lieutenant Caviness and Officer Smith testified at deposition that Plaintiff was already wearing handcuffs when they arrived to the vicinity of the bodega. In addition, as noted above, Officer Menendez's bodycam footage depicts Officer Smith asking Menendez to get his handcuffs back for him. (Menendez BWC 2, ECF No. 211-6, at 0:55–0:58.) Finally, as detailed below, the deposition testimony from multiple officers clearly establishes that Officer Jean-Baptiste was the "arresting officer," in that he completed the arrest paperwork, as discussed below.

25; *id.* at ECF p. 68, at 48:2–4.) At one point, Caviness testified that Menendez was present in the bodega. (*See id.* at ECF p. 66, at 38:11–25 (testifying that "two officers walked him out . . . I know Menendez did").) Later, Caviness testified that he could not remember who was in the store with Plaintiff. (*See id.* at ECF p. 66, at 39:9–25 ("When Menendez arrived, was Mr. Lurch still inside of the store?" "I don't remember." "Didn't you testify that Officer Menendez walked Plaintiff out of the store?" "I'm not sure. I said he probably . . . I don't know exactly who and I don't know exactly when, the time frame.").) Caviness testified that he did not know of any altercations after Plaintiff was handcuffed, and that "most of [his] recollection [was] coming from" the footage of the incident. (*Id.* at ECF p. 66, at 41:3–16 ("After Mr. Lurch was placed in handcuffs, was he involved in any other physical altercation?" "Not to my knowledge.").)[13]

The deposition testimony, taken together, suggests that Menendez and Hanisch were next to arrive. Menendez testified that, prior to responding to the scene of Plaintiff's arrest, he and McGibbon he had been assigned to visit a community center that evening. (Menendez Dep., ECF No. 218, at ECF pp. 542–43, at 81:13–82:17.) Menendez's memo book included an entry that stated "01:47:85, Housing Lieutenant at Saratoga Avenue and Fulton Street," and he testified that his lieutenant, whom he identified as Lieutenant Caviness, had called for assistance at that location. (*Id.* at ECF

---

[13] The Court notes that Caviness testified repeatedly that there is no way any officers would have beaten Plaintiff, or shoved Plaintiff's face into a metal bench while he was there. (*E.g.*, Caviness Dep., ECF No. 218, at ECF p. 70, at 55:20–56:4, 57:13–23 ("Is it possible an officer injured Mr. Lurch while you were not looking?" "That would not happen while I was there, it would not, it wouldn't happen. I wasn't watching him every second, but I did see him several times throughout the night."); *id.* at ECF p. 76, at 78:8–11 ("I'm a zillion percent sure that none of my cops hit him or slammed his head into a bench, it didn't happen."); *id.* at ECF p. 76, at 78:18–20 ("There's no way I would have stood by and let them slam somebody's head into the bench at the bus stop.").)

16

p. 544, at 86:1–86:13.) Menendez and his partner, then-Police Officer Hanisch, responded to the scene. (*Id.* at ECF p. 544, at 89:4–17.) The next entry, marked as 1:53 or 1:55, included "1084," indicating that Menendez had arrived on scene, followed by an entry at 2:20, when he escorted Emergency Medical Services ("EMS") and Plaintiff to Kings County Hospital. (*Id.* at ECF p. 545, at 91:5–23.)[14] Menendez testified that when he arrived at the scene of the fight at the bodega, Lieutenant Caviness and Officer Smith, who served as Caviness's driver, were already there, along with McGibbon, as well as others, who Menendez could not remember at the time of his deposition. (*Id.* at ECF p. 549, at 106:23–108:4; *id.* at ECF p. 550, at 111:21–112:2.) When he arrived, Officer Smith was with Plaintiff, who was already handcuffed and sitting on a bench; Menendez observed that Plaintiff was bleeding when he first saw him. (*Id.* at ECF pp. 549–50, at 109:20–110:14; *id.* at ECF p. 552, at 118:17–119:3.) Menendez also testified that, "from reviewing my body-worn camera footage, Mr. Lurch tried to stand up and walk away," in response to which Menendez prevented him from walking away by "grabb[ing] his arm," which made Plaintiff upset. (*Id.* at ECF p. 552, at 118:6–12, 119:23–120:6.) Menendez also remembered that there was a woman across the street yelling, and that Plaintiff yelled back at her, but that she was never near Menendez and that he never interacted with her. (*Id.* at ECF pp. 553–54, at 122:7–25, 125:25–126:2.)

During his deposition, Menendez was asked a number of questions regarding his body worn camera footage. Notably, Menendez testified that Officer Smith told him "to retrieve his handcuffs from Mr. Lurch," which Menendez understood to mean that it

---

[14] Officer Menendez testified that he likely wrote all of these entries in his memo book at the same time, before his shift ended, and that he was in the habit of looking at his watch to make note of the time of the events he recorded. (Menendez Dep., ECF No. 218, at ECF p. 545, at 93:3–17; *see also id.* at ECF p. 545, at 90:18–91:4.)

was Officer Smith's handcuffs that were used to handcuff Plaintiff; this conversation was captured on the second video from Menendez's body worn camera, as discussed above. (*Id.* at ECF pp. 570–71, at 193:21–194:4.) Menendez further testified that he did not know who had put the handcuffs on Plaintiff and that he (Menendez) was sure that he had not placed Plaintiff in handcuffs because Plaintiff was "already in cuffs by the time [Menendez] met him." (*Id.* at ECF p. 571, at 194:5–195:10.)

Sergeant Hanisch (who was a Police Officer at the time of the incident underlying this case), testified that he responded to the scene of Plaintiff's arrest, together with his partner Officer Menendez, because they received a radio call from Lieutenant Caviness, who had been flagged down. (Hanisch Dep., ECF No. 218, at ECF p. 336, at 91:22–92:25; *id.* at ECF p. 337, at 94:2–9, 95:24–96:6.) At the time they arrived, Lieutenant Caviness and his driver, Officer Smith, were the only officers on scene. (*Id.* at ECF p. 337, at 94:11–95:10.) Upon arrival, Hanisch noticed that Lurch was near a bus stop with Officer Smith, and he was bleeding from his head and had blood on his shirt. (*Id.* at ECF p. 337, at 96:12–97:25.) Hanisch also testified that he did not recall exactly when he activated his body worn camera, but that it may not have been activated right away because "[w]e weren't sure what the job was." (*Id.* at ECF p. 341, at 112:18–113:24.) Hanisch further testified that his memo book had an entry marked with a time stamp of 1:47, which was the approximate time that the call came over the radio, and that it took him and Menendez approximately five minutes to travel to the corner of Saratoga Avenue and Fulton Street, where the bodega was located. (*Id.* at ECF p. 349, at 143:17–144:8; *id.* at ECF p. 338, at 99:12–19.) His next memo book entry indicated that 1:55 a.m. was the approximate time that he and Menendez arrived to the location, and that, at approximately 2:20 a.m., Hanisch escorted EMS to Kings County Hospital. (*Id.* at ECF p. 350, at 146:23–147:17.) Hanisch further testified that he believed Plaintiff was under

arrest, but he did not (and would not) have a memo book entry for Plaintiff's arrest because "[w]e weren't the arresting officers." (*Id.* at ECF p. 351, at 152:2–25.) Hanisch testified that he and Menendez were instructed to accompany EMS to the hospital by a supervisor, either the lieutenant or the sergeant on scene, Sergeant Craigg, who had arrived after Hanisch; Hanisch went to the hospital in a police car while Menendez rode in the ambulance. (*Id.* at ECF p. 352, at 155:1–20.) Hanisch stayed at the hospital until after 5:00 a.m., when an officer from the 81st Precinct took over because, at that point, as Hanisch understood it, Plaintiff was in the custody of that precinct since it was their arrest. (*Id.* at ECF pp. 355–56, at 169:3–170:20.) Hanisch also testified that Officer Menendez did hold Plaintiff so that he would not leave the scene, but that Menendez did not use other force or cause lacerations to Plaintiff's head, which were already present when they arrived at the scene. (*Id.* at ECF p. 358, at 180:22–181:3; *id.* at ECF p. 359, at 182:15–183:4; *id.* at ECF p. 362, at 195:18–196:4.)

McGibbon, who was assigned to the PSA, also responded to the scene, but could not recall what time he and his partner, Pira,[15] arrived. (McGibbon Dep., ECF No. 218, at ECF p. 255, at 54:16–20; *id.* at ECF p. 257, at 63:15–25.) When they arrived, other officers were already there, including Officers Menendez and Hanisch, and three lieutenants,

_____

[15] Officer Pira testified, in substance, that his recollection of the incident was "[s]tanding on the sidewalk with a handcuffed person sitting on a bench in front of me," and that the person (Plaintiff) was handcuffed when he arrived. (Pira Dep., ECF No. 218, at ECF p. 272, at 11:25–12:15.) With the benefit of having reviewed his body camera footage, Pira recalled that Menendez and Hanisch were there when he arrived, and he also remembered that Craigg and Galloza were there, in addition to two other officers that he did not know, one of whom was likely a lieutenant and wore a white shirt. (*Id.* at ECF p. 272, at 13:14–21; *id.* at ECF p. 273, at 15:11–17:19; *see also id.* at ECF p. 286, at 66:25–68:16.) EMS arrived after he arrived. (*Id.* at ECF pp. 272–73, at 13:24–14:1.) At the time Pira arrived, Plaintiff was in handcuffs and he was not aware of anything that happened before, or why, he had been put into handcuffs. (*Id.* at ECF p. 287, at 70:1–22.) Pira testified that he activated his body worn camera when he was behind the arrested individual, after he had been on scene for about a minute. (*Id.* at ECF p. 287, at 71:15–23.)

including Lieutenant Caviness. (*Id.* at ECF p. 258, at 68:17–69:17.) McGibbon also testified that Galloza and Craigg came to the scene, but he could not remember if they were there when he arrived or if they showed up later. (*Id.* at ECF p. 259, at 70:8–15.) McGibbon also recalled that Plaintiff was already in handcuffs when they arrived at the scene and was positioned by a bench, and that things were calm "[f]or the most part," but that Plaintiff was acting a "little bit erratic." (*Id.* at ECF p. 259, at 71:5–72:1.) McGibbon also testified that he observed that Plaintiff was injured, but he did not remember if he learned what had happened. (*Id.* at ECF p. 260, at 74:6–75:9.) In terms of physical contact with Plaintiff, McGibbon stated that Menendez had his hand on Plaintiff's arm, and that he and another officer tried to help Plaintiff get into the ambulance, but that he saw and heard of no other physical contact between Plaintiff and any police officer. (*Id.* at ECF p. 260, at 76:17–77:12.)

Sergeant Tremayne Craigg, who was assigned to the PSA, also testified about his observations the night Plaintiff was arrested. (*See generally* Craigg Dep., ECF No. 218, at pp. 375–422.) Craigg testified that he reviewed his body camera footage from the night of the incident and that it depicted that "at the point when I got there, [Plaintiff] was at the bus stop bench, they were asking him to sit." (*Id.* at ECF p. 377, at 8:20–22; *id.* at ECF p. 378, at 10:4–7.) He continued: "To me he became combative and then at one point he said that he was going to say Officer Menendez beat him up. And then he later on went on to say that the people in the store hit him with a bat or something." (*Id.* at ECF p. 388, at 50:3–8.) Craigg testified that he was working with Galloza, who was serving as his

driver, and that his Lieutenant (Caviness) was also on scene that night.[16] (*Id.* at ECF p. 388, at 50:3–9; *id.* at ECF p. 388, at 51:16–52:7.) When they arrived, Craigg saw Menendez, Hanisch, Lieutenant Caviness and Caviness's driver, who might have been Officer Smith, but he was not sure about his name, and possibly others, whom Craigg did not know. (*Id.* at ECF p. 392, at 67:11–68:4; *see also id.* at ECF pp. 398–99, at 90:20–94:19.) Craigg further testified that Menendez "had [Lurch's] arm." (*Id.* at ECF p. 392, at 69:14–16.) He also observed that Lurch was already in handcuffs. (*Id.* at ECF p. 397, at 88:16–18.)

Officer Maharskyy, who was assigned to the 81st Precinct, testified that he arrived on the scene of Plaintiff's arrest at approximately 2:00 a.m., and that when he arrived, Plaintiff was in an ambulance. (Maharskyy Dep., ECF No. 218, at ECF p. 150, at 9:7–8; *id.* at ECF p. 154, at 23:12–14; *id.* at ECF p. 163, at 60:4–61:1.) Maharskyy further testified that, after arriving, he activated his body camera before interviewing the two bodega workers. (*Id.* at ECF p. 163, at 59:2–5.) After interviewing the two bodega workers, he was involved in arresting them at approximately 3:40 a.m., after which he and his partner transported the bodega workers to the precinct to lodge them, and that Officer Jean-Baptiste volunteered to complete the arrest paperwork at the precinct. (*Id.* at ECF pp. 154–55, at 25:24–26:8; *id.* at ECF p. 157, at 35:14–36:13.)

---

[16] Galloza's deposition testimony largely corroborates Craigg's. He testified that, prior to his deposition, he reviewed his body camera footage, and that Mr. Lurch was already in handcuffs when his footage begins. (Galloza Dep., ECF No. 218, at ECF p. 428, at 15:9–12.) His footage depicted "[a]rriving on scene with numerous other officers that were already on scene. The defendant sitting on a bench, handcuffed, then being brought in to the ambulance." (*Id.* at ECF p. 428, at 14:15–20; *see also id.* at ECF p. 436, at 47:2–6.) Galloza further testified that he did not recall any officers using force on Lurch or hearing that any officer had done so. (*Id.* at ECF p. 441, at 69:9–17; *see id.* at ECF p. 442, at 70:19–22.)

Officer Lapin, Officer Maharskyy's partner, was also deposed. (*See* Lapin Dep., ECF No. 218, at ECF p. 171, at 9:21–23 (confirming Maharskyy was his partner); *see generally id.*) Like Maharskyy, Lapin testified that he was not present when Plaintiff was arrested, and that when he and Maharskyy arrived, he recalled interacting with a "housing lieutenant and given some kind of information about what he came upon. And then I remember having to arrest the bodega workers." (*Id.* at ECF p. 185, at 65:3–6; *see id.* at ECF p. 186, at 66:3–20 (confirming that he was not present for Plaintiff's arrest).) In addition, Lapin recalled there being an ambulance present, and that someone in the ambulance had been arrested, but he did not "know what that was originally for." (*Id.* at ECF p. 185, at 65:6–9.) He indicated that, after speaking with the housing lieutenant, he spoke with his lieutenant (Smith). (*See id.* at ECF p. 186, at 67:14–68:11.) Lapin also testified regarding how he was involved in arresting the bodega workers, but that Officer Jean-Baptiste (who was not present at the scene of the arrest) asked to, and did, complete the arrest paperwork. (*Id.* at ECF p. 189, at 81:3–23; *id.* at ECF pp. 190–92, at 85:25–90:13.)

Lieutenant David Smith from the 81st Precinct, which covers Stuyvesant Heights in Brooklyn, also responded to the scene later that night.[17] (*See generally* David Smith Dep., ECF No. 218, at ECF pp. 209–32.) Lieutenant Smith testified that he arrived at the scene between 3:00 a.m. and 4:00 a.m.; his body camera footage started at 3:37 a.m., after he had left his vehicle. (*Id.* at ECF p. 217, at 32:21–25; *id.* at ECF p. 228, at 76:3–24 (explaining that he did not turn his camera on right away but did so when "officers

---

[17] Unless otherwise noted, "Officer Smith" refers to Officer Kenyon Smith, who responded to the scene with Lieutenant Caviness while Plaintiff was still present, and "Lieutenant Smith" refers to David Smith, who responded after Plaintiff left the scene.

were effecting an arrest and [he] was present on the scene").) As to who took responsibility for the arrests that were made that night, Lieutenant Smith testified that when officers from more than one precinct or service area respond to the same scene, the arrest is typically made by "the precinct of occurrence."[18] (*Id.* at ECF p. 213, at 15:3–9; *id.* at ECF p. 215, at 22:17–25.) Lieutenant Smith testified that when he arrived at the scene with Tadros, two of the officers from the 81st Precinct, Lapin and Maharskyy, were already there, but there were no other officers present. (*Id.* at ECF p. 219, at 39:8–40:6.) Lapin and Maharskyy advised Lieutenant Smith that some housing officers had "removed a subject from that location" and Smith assumed that he was taken into custody and arrested prior to his arrival. (*Id.* at ECF p. 219, at 40:7–24.) Lieutenant Smith also explained that Officer Tadros speaks Arabic, so he spoke with the two bodega workers, who described the fight and pulled up the video of what happened, which Officer Tadros recorded by taking a video of it.[19] (*Id.* at ECF p. 219, at 41:4–15; *id.* at ECF p. 221, at 48:5–21.) Lieutenant Smith ultimately verified the arrest of the two bodega

---

[18] This testimony was corroborated by Craigg, who testified that when more than one unit responds to a scene, including a housing unit and a non-housing unit, "usually if it's a Housing job, the Housing cops would take it. But if precinct got there first, then they want to take it, it's not really a big debate." (Craigg Dep., ECF No. 218, at ECF p. 381, at 22:20–24.) Similarly, if officers from outside a PSA respond to the same call as PSA officers, Sergeant Craigg explained that: "Sometimes the precinct wants — they want to take over the job, so they'll just take the arrest." (*Id.* at ECF p. 381, at 23:13–18.) Sergeant Craigg further testified that if a supervisor is there, the supervisor usually would decide who takes the arrest. (*Id.* at ECF p. 381, at 23:19–22.)

[19] Tadros's testimony largely corroborates Lieutenant Smith's. Like Smith, he recalled responding to the scene, but that Plaintiff had already been taken to the hospital by the time he arrived. (Sept. 20, 2023 Tadros Dep., ECF No. 218, at ECF p. 112, at 22:5–8.) Tadros also testified that, when they arrived, Maharskyy and Lapin were the only officers present. (*Id.* at ECF p. 112, at 23:10–23.) Because Tadros speaks Arabic, he talked to the bodega workers and collected the surveillance footage. (*Id.* at ECF p. 113, at 26:2–27:6.) He also recalled that the arresting officer was Officer Jean-Baptiste, and that he shared the surveillance footage with Jean-Baptiste, although he could not recall how. (*Id.* at ECF p. 114, at 30:12–31:20.)

workers and testified that the 81st Precinct took responsibility for the arrest processing of Plaintiff as well, with Jean-Baptiste serving as the arresting officer. (*Id.* at ECF pp. 220–21, at 45:6–46:23; *id*. at ECF p. 222, at 51:1–4.) Lieutenant Smith testified that he later saw Plaintiff at Kings County Hospital, where Plaintiff told him that he had been beaten up by the men at a grocery store; he did not inform the Lieutenant that any police officer had used force against him. (*Id.* at ECF pp. 222–23, at 51:18–55:9.) Lieutenant Smith also testified that he made the decision for the 81st Precinct to take Plaintiff's arrest, after speaking briefly with the housing lieutenant; he directed Jean-Baptiste to complete the arrest paperwork.[20] (*Id.* at ECF p. 224, at 58:3–60:4; *id*. at ECF pp. 225–26, at 65:16–67:20.)

Finally, Jean-Baptiste testified that his role in the arrest was as "the arresting officer," meaning that he was the officer who "completed the paperwork in regards to his arrest."[21] (*See* Jean-Baptiste Dep., ECF No. 218, at ECF p. 464, at 16:16–23.) Officer Jean-Baptiste explained that even though he did not respond to the scene of the incident at the bodega, he watched the video of the crime occurring and "was able to determine the charges and [he] was able to do the arrest paperwork." (*Id.* at ECF p. 465, at 19:10–13.) He also spoke to the two complaining victims (the bodega workers), who were

---

[20] When pressed on this question at his deposition, Lieutenant Smith explained that he asked Officer Jean-Baptiste to handle the paperwork because "[h]e was willing, he was available . . . And just from a personnel standpoint, I thought it was the right choice to make as a supervisor." (David Smith Dep., ECF No. 218, at ECF p. 227, at 73:12–16.)

[21] Officer Jean-Baptiste did not recall who asked him to be the arresting officer or what they said to him, but he did recall speaking with Maharskyy and Lapin about the arrest, and he did not recall speaking with Lieutenant Smith. (*See* Jean-Baptiste Dep., ECF No. 218, at ECF p. 483, at 93:15–94:9, ECF p. 488, at 113:18–22; *see also id*. at ECF p. 485, at 98:24–200:9, ECF p. 488, at 111:8–112:11 (discussing his conversation with Maharskyy and Lapin about taking the arrest, without specific reference to which of the three arrests that had occurred in connection with this incident).)

brought to the 81st Precinct, while Plaintiff was in the hospital. (*Id.* at ECF p. 465, at 20:21–21:20.) Jean-Baptiste later picked Plaintiff up from the hospital, together with another officer from the 81st Precinct, Officer McDuffie, who had spent time with Plaintiff at the hospital. (*Id.* at ECF pp. 471–72, at 45:24–47:2.) Jean-Baptiste was not aware of the precise circumstances of when and where Plaintiff was handcuffed or how many officers responded to the scene. (*Id.* at ECF p. 473, at 50:4–52:1.) He did not know who took Plaintiff into custody or how many officers were present, and he did not speak to that officer about whether any force was used to effect Plaintiff's arrest. (*Id.* at ECF p. 480, at 78:17–79:13.)

None of the officers who were on the scene before the start of the body camera footage testified that any officers used force on Plaintiff after he was taken into custody, and, other than the varying and inconsistent comments made on the body worn camera footage described above, Plaintiff did not tell any member of the NYPD that he had been assaulted that night by an officer. (*See, e.g.*, David Smith Dep., ECF No. 218, at ECF p. 223, at 55:5–9 ("During your conversation with Mr. Lurch [about the source of his injuries] at that time, did he tell you that a police officer had used force against him? "No."); *id.* at ECF p. 227, at 72:16–73:4 ("As you sit here today, do you have knowledge that a member of the NYPD used force on Mr. Lurch on August 17, 2019?" "No." "Has anyone told you that a police officer used force on Mr. Lurch on August 17, 2019?" "No."); Lapin Dep., ECF No. 218, at ECF p. 187, at 72:17–73:5 (responding that he did not recall whether, after he arrived on the scene post-arrest, anyone indicated that force had been used); McGibbon Dep., ECF No. 218, at ECF p. 259, at 71:5–72:1 (describing the scene as "calm" other than Lurch, who was in handcuffs and who was "acting a little bit

erratic").)[22] Nor did any officers recall hearing about Officer Menendez using force against someone in his custody or bragging about doing so in other circumstances. (*See, e.g.*, Pira Dep., ECF No. 218, at ECF p. 294, at 100:22–101:5.)

## III. Documentary Evidence and Medical Records

In addition to the foregoing, Plaintiff has submitted arrest paperwork regarding his and the bodega workers' arrests. (Pl. Record, ECF No. 218, at ECF pp. 6–12, 36–54.) The arrest paperwork for all three men lists Jean-Baptiste as the arresting officer. (*See id.*) The medical records have also been submitted, and indicate that Plaintiff told multiple hospital workers, including intake staff, a social worker, and a doctor that he was beaten with a bat in the bodega. (Defs. 56.1, ECF No. 212, ¶¶ 21–23 (citing Medical Records, ECF Nos. 211-7, 209-3 (sealed version)).)[23]

## IV. Plaintiff's Deposition Testimony, Rule 56.1 Statement, and Affidavit in Support of Summary Judgment

The excerpts of Plaintiff's deposition testimony in the summary judgment record include an account of how the fight in the bodega occurred, with Plaintiff testifying that he threw a number of items on the floor and was struck a number of times by the bodega workers with the bat, which left him "actually bleeding." (Pl. Dep., ECF No.

---

[22] Many of the officers testified that they could not recall much about the arrest or events surrounding the arrest. (*See, e.g.*, Caviness Dep., ECF No. 218, at ECF p. 66, at 39:9–25; Pira Dep., ECF No. 218, at ECF p. 283, at 55:8–25 (stating that he had no recollection of responding to the incident).) Several did note Lurch's injuries. (*See, e.g.*, McGibbon Dep., ECF No. 218, at ECF p. 260, at 74:6–19 (describing his impression of Mr. Lurch's visible injuries).)

[23] Under Rule 56, the court only considers admissible evidence when determining whether any material facts are in dispute. *BMaddox Enters. LLC v. Milad Oskouie, Osko M Ltd.*, No. 17-CV-1889 (RA), 2021 WL 3675072, at *5 (S.D.N.Y. Aug. 18, 2021); *see* Fed. R. Civ. P. 56. Statements in medical records are typically admissible as an exception to the hearsay rule because they are generally considered reliable so long as they were "prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated." *Bermudez v. City of New York*, No. 15-CV-3240 (KAM) (RLM), 2019 WL 136633, at *10 (E.D.N.Y. Jan. 8, 2019) (quotation marks omitted). *See generally* Fed. R. Evid. 803(6).

211-2, at 41:1–44:9.) Plaintiff also testified, in reference to the body camera footage, that "every officer had body footage, they edited their footage to start at the exact same time," and that, accordingly, he found it to be suspect. (Pl. Dep., ECF No. 216-1, at 24:1–25:3; *see also id.* at 104:12–105:11 (testifying that the body camera footage had been edited and speculating that the attorneys for New York City might be withholding the complete footage).) He also asserted that "[e]very officer there had body cameras and I saw it was on." (*Id.* at 133:22–23.)

Plaintiff also testified that when he walked out of the bodega, there were a number of officers present, and he had an interaction with a black sergeant, who said "cuff him" after Chantel told the officers that Plaintiff was "on the run from parole." (*Id.* at 49:3–50:3, 52:13–53:9.) Plaintiff further testified that, after he was handcuffed, "she is hostile and these officers still got this girl in front of me, and she ran like she is foaming out the mouth . . . but she became hostile with me and I got scared. So, I tried to kick her away with my foot. I tried to kick her away." (*Id.* at 53:15–20.) He further testified, in substance, that the sergeant directed another officer, Menendez, to handcuff him, and "I think what happened, once I got handcuffed and once I kicked Chantel (phonetic) away, try to get her away from me, told the officers to get her away from me, she started punching me in my face while I was handcuffed." (*Id.* at 54:15–25.) Plaintiff then testified that he was not sure whether the individual who ordered his arrest was a lieutenant or a sergeant, but that he was wearing a white shirt. (*See id.* at 56:11–57:10.)

In terms of the alleged assault, Plaintiff testified at his deposition that "Menendez was actually holding me" when Chantel was punching him, and that numerous officers were present on the scene at that time. (*Id.* at 59:23–60:25.) Plaintiff also claimed that the assault caused injuries to his face, stating that: "Most of this assault occurred while the officer had his knee in my back and his hand pushed my

head into the metal bench as she was attacking me. That's the most of this that occurred. That probably occurred for like two minutes. As far as when we were standing up, that wasn't very long, that was probably like 20, 30 seconds." (*Id.* at 68:13–19.) Plaintiff also claimed at deposition that his injuries were caused by the officer slamming his head into a metal bench, and that:

> After I was slammed into a metal bench, I started bleeding from my face because the incident, after he held me down and he realized because I told him I was not going to sue him or whatever, he let me up and then the supervising officer told Chantel (phonetic) because they were like, what are you going to do with her, she assaulted him, they were like, we are not charging her, I'll just tell her she can leave.

(*Id.* at 68:23–69:5.) In regard to the officers other than Menendez, Plaintiff testified that: "As far as all of the other officers, the only reason why I brought their name up is because they all sat there and watched. They didn't do nothing, to be honest with you." (*Id.* at 75:18–21.)

Plaintiff's 56.1 statement, which does not cite any evidence, claims that Menendez arrested him, denies that Menendez started his body camera footage when he arrived on the scene, and claims that Menendez beat Plaintiff while he was handcuffed. (*See* Pl. 56.1, ECF No. 206, ¶¶ 5–6 (stating Menendez was directed to arrest Plaintiff), ¶ 6 (stating that Menendez did not activate his body camera upon arrival), ¶ 11 (stating that Menendez beat him).)

In a declaration dated November 5, 2024, which Plaintiff submitted in opposition to the motion for summary judgment, Plaintiff repeats some of these claims, and alleges additional factual details. Plaintiff asserts that Menendez and the "hostile female" attacked him, claiming that "Menendez attacked the plaintiff by body slamming him face first into a metal bench and holding him down in a downward dog position as he scraped the plaintiff's face against the metal bus stop bench he was holding him on as

the hostile female attacked the plaintiff." (Pl. Decl. in Opp'n, ECF No. 208, ¶ 5.) Plaintiff

also claims for the first time that Caviness waited until Menendez stopped beating

Plaintiff to tell the officers to activate their body cameras. (*See id.* ¶ 7 (claiming that

Caviness told the woman she could leave after Menendez stopped holding him down

and the woman stopped attacking Plaintiff, and that Caviness told the officers that they

should activate their body cameras at that time).)

## DISCUSSION

Construing Plaintiff's claims and interpreting his filings generously given his *pro*

*se* status and viewing all of the evidence in the light most favorable to the non-movant,

there are three potential factual disputes related to Plaintiff's claims.[24]

First, Plaintiff alleges that it is not clear who arrested him. (Pl. Add'l Contentions,

ECF No. 221, at ECF p. 3; *see* Arrest Report, ECF No. 218, at ECF pp. 7–9 (listing "POM

JeanBaptiste, Schedler" as the arresting officer and "Sgt Gavilanes Vivi" as the

approving officer or supervisor); Tadros Dep., ECF No. 218, at ECF p. 114, at 30:25–31:1

(stating that Officer Jean-Baptiste was the arresting officer); Tadros Dep., ECF No. 218,

at ECF p. 119, at 50:15–25 (responding that he is unsure whether Jean-Baptiste was on

the scene); Caviness Dep., ECF No. 218, at ECF p. 64, at 33:2–14 (stating that Smith put

Plaintiff in handcuffs).)

Second, Plaintiff alleges in his recent declaration that the officers chose not to

activate their body cameras while Menendez was beating him, and that Lieutenant

---

[24] Plaintiff also disputes, again without citing any record evidence, a number of facts that are not material. For example, he disputes that he tried to go into a back room in the bodega. (*See* Pl. 56.1, ECF No. 206, ¶ 2.) The Court's analysis here focuses on facts in dispute that are potentially relevant to Plaintiff's legal claims.

Caviness only ordered them to activate the cameras after the assault ceased.[25] (Pl. Opp'n, ECF No. 207, at ECF p. 1; Pl. Decl. in Opp'n, ECF No. 208, ¶¶ 7–8.)

Third, Plaintiff alleges that he was assaulted while handcuffed. Specifically, he claims that a female civilian and Menendez both attacked him while he was handcuffed and "while other officers watched." (Pl. Add'l Contentions, ECF No. 221, at ECF p. 2; *see also* SAC, ECF No. 69, at ECF pp. 6–10; Pl. Decl. in Opp'n, ECF No. 208, ¶¶ 4–5.) He also alleges that "after discovery, the defendants have adduced no evidence to render these allegations false." (Pl. Add'l Contentions, ECF No. 221, at ECF p. 2.)

For the following reasons, the Court finds that there are no material facts actually in dispute. The Court therefore recommends granting summary judgment to Defendants on all of Plaintiff's claims.

## I. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Darnell v.*

---

[25] In light of Plaintiff's *pro se* status, the Court considered whether to construe this argument as positing that Lieutenant Caviness intended to prevent video recordings, which, if established, could allow the Court to make an adverse inference regarding the lack of footage. *See* Fed. R. Civ. P. 37(e). However, Plaintiff submits no evidence in support of this claim; it is nothing but surmise and conjecture. Further, Plaintiff's prior insistence, under oath, that the officers were recording the footage and that they must have edited or deleted the footage is entirely inconsistent with the very recently advanced claim that he heard Caviness direct officers to start recording after de-escalation. (*See* Pl. Dep., ECF No. 216-1, at 24:11–19, 25:7–12, 69:12–13, 71:21–25, 104:12–105:11, 111:18–20, and 133:6–134:2.) Given that this claim is supported only by Plaintiff's declaration prepared in response to a motion for summary judgment more than five years after the events, and by his additional written contentions, (*see* Pl. Add'l Contentions, ECF No. 221), the Court finds that this assertion does not create a genuine issue for trial under the sham affidavit doctrine. *See Hayes v. NYC Dept' of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony. . . . Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial.").

*Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Further, a factual dispute is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113–14 (2d Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). The Court must "view all facts in this case in the light most favorable to the non-movant, resolving all ambiguities in [the non-movant's] favor." *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021). "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Id.* (alterations and quotation marks omitted).

The movant "bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Nick's Garage, Inc.*, 875 F.3d at 114 (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 323). Once the moving party has satisfied their burden, "'the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" *Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 51 (E.D.N.Y. 2021) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "At the summary judgment stage, a nonmoving party 'must offer some hard evidence showing that its version of the events is not wholly fanciful.'" *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998)).

Summary judgment must be denied "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir 2002). Further, Rule 56(c) provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c); *see also Lener v. Hempstead Pub. Sch.*, 55 F. Supp. 3d 267, 274 (E.D.N.Y. 2014). In addition, courts "may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must review all of the evidence in the record." *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 386 (2d Cir. 2020) (quotation marks omitted).

## A. Credibility and Contradictory Statements

When considering whether a movant is entitled to summary judgment, the Court cannot weigh the evidence or make credibility determinations to decide the truth of the matter, but instead must determine "'whether there is a genuine issue for trial.'" *Green v. Town of E. Haven*, 952 F.3d 394, 406 (2d Cir. 2020) (quoting *Anderson*, 477 U.S. at 249). District courts are "required to 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001)); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).

While credibility assessments are typically the province of the jury, "a party's affidavit may not create an issue of fact by 'contradict[ing] the affiant's previous

deposition testimony.'" *Maxwell v. City of New York*, 380 F.3d 106, 109 (2d Cir. 2004) (emphasis in original) (quoting *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir. 1996), *supplemented*, 108 F. App'x 10 (2d Cir. 2004)). Nor can a party rely on their "testimony to raise a genuine issue of fact" if "that testimony is inescapably and unequivocally contradicted by [his] own sworn and written statements" and where he "offers no plausible explanation for the multitude of contradictions." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 88 (2d Cir. 2019); *see also Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 470 (S.D.N.Y. 1998). "'[I]n the rare circumstance where the plaintiff relies almost exclusively on [his] own testimony, much of which is contradictory and incomplete,' to establish a triable issue of fact, it may well 'be impossible' for the court 'to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.'" *Bentley*, 935 F.3d at 86 (quoting *Jeffreys*, 426 F.3d at 554). At the same time, however, as the Second Circuit recently reiterated, a plaintiff's testimony, standing alone, may be independently sufficient to raise a genuine issue of material fact. *See Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39, 49 (2d Cir. 2025). As the *Knox* court observed, "[t]estimony, of course, includes sworn statements made in depositions or declarations under the penalty of perjury," noting that "'[t]here is nothing in Federal Rule of Civil Procedure 56(c) to suggest that nonmovants' affidavits alone cannot — as a matter of law — suffice to defend against a motion for summary judgment.'" *Id.* at 49 (alteration omitted) (quoting *Danzer v. Norden Sys. Inc.*, 151 F.3d 50, 57 (2d Cir. 1998)).

**B. Standards for Evaluating *Pro Se* Litigants' Filings**

It is well established that "[a] document filed *pro se* is 'to be liberally construed,' . . . and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94

(2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). The Court is typically obligated to interpret the submissions of a *pro se* litigant "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis and quotation marks omitted); *Vartholomeou v. City of New York*, No. 15-CV-4996 (PKC) (LB), 2018 WL 11466965, at *4 (E.D.N.Y. Jan. 2, 2018) (applying the standard set forth in *Triestman* in the summary judgment context), *report and recommendation adopted*, Mar. 5, 2018 ECF Order Adopting R. & R.; *see also Jorgensen v. Epic/Sony Recs.*, No. 00-CV-9181 (JFK), 2002 WL 31119377, at *2 (S.D.N.Y. Sept. 24, 2002) (applying the lenient standard but noting that "the Court's application of this different standard does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment"), *aff'd in part, vacated in part*, 351 F.3d 46 (2d Cir. 2003). That said, when a *pro se* litigant is "'extremely litigious'" and "'quite familiar with the legal system and with pleading requirements,'" the "deference usually granted to *pro se* plaintiffs need not be expansively drawn." *Johnson v. Eggersdorf*, 8 F. App'x 140, 143 (2d Cir. 2001) (quoting *Davidson v. Flynn*, 32 F.3d 27, 31 (2d Cir. 1994)) (applying this narrowed deference to *pro se* litigant who had 12 pending lawsuits in the relevant district).

## II.  Analysis of Plaintiff's Claims

As discussed above, Plaintiff brings three claims under 42 U.S.C. § 1983, alleging that Officer Menendez used excessive force while he was handcuffed, that all other officers failed to intervene and to protect him from that attack, and that all Defendant officers failed to protect him from the female civilian's assault. (SAC, ECF No. 69, at ECF pp. 6–10.) Specifically, he alleges that while handcuffed, he was "using his foot to push a female individual away from him because at the time this female was actively punching the Plaintiff in his face." (SAC, ECF No. 69, at ECF p. 10.) As that occurred, he

alleges that he "was basically jumped" by Officer Menendez, who, while Plaintiff was handcuffed, "slamm[ed] the plaintiff's face, facefirst into a metal bench and scrap[ed] the plaintiff's face amongst the benches ridges while holding the plaintiff down so he can be further attacked by the hostile female." (*Id.*) He alleges that the other Defendant officers watched and did nothing to intervene or to protect him. (*Id.* at ECF pp. 8, 9.)

Defendants argue that summary judgment is appropriate because, based on the evidence in the summary judgment record, "no reasonable jury could believe that Officer Menendez used excessive force on plaintiff." (Defs. Mem., ECF No. 213, at 1.) They argue that "plaintiff's testimony is incredible as a matter of law," and that both the video evidence and medical records "directly contradict plaintiff's claim that Officer Menendez used excessive force on him." (*Id.*) Defendants argue that the failure to intervene claim fails because "there is no underlying constitutional violation," and the failure to protect claim fails because the underlying claim that a woman assaulted him lacks support and is contradicted by video evidence of Plaintiff's statements on the night of the incident. (*Id.* at 1, 13–14.)

In response, Plaintiff primarily argues that a jury could find that Defendants are lying. He emphasizes that most Defendants did not activate their body cameras in violation of department policy.[26] (Pl. Opp'n, ECF No. 207, at ECF p. 1.) Plaintiff also argues that:

> It is reasonable for the court . . . to conclude that [O]fficer [M]enendez did in fact arrest the plaintiff and might have used unnecessary force. For the simple fact that the arresting officer is usually the officer that is supervising an arrestee

---

[26] The Court takes judicial notice that in August of 2019, the NYPD was wrapping up Phase 3 of its body camera rollout program. *See* New York City Police Department, Body-Worn Cameras: What You Need To Know, https://www.nyc.gov/site/nypd/about/about-nypd/equipment-tech/body-worn-cameras.page.

> physically after an arrest, which the body camera video
> suggests Officer [M]enendez was doing by having the
> plaintiff in his physical control.

(*Id.* at ECF pp. 1–2.) Plaintiff further avers that no NYPD officer credibly testified about the identity of the arresting officer, which, combined with the failure to turn on their body cameras at the appropriate time, suggests that "the Officer defendants may have not conducted themselves in a lawful manner on the day of incident." (*Id.* at ECF p. 2.) He urges the Court to discount his contradictory statements because he "had to make it appear to P.O. menendez that he wasn't serious about filing a lawsuit against him because he was afraid of being killed by this officer," and includes additional summaries of conversations and allegations without pointing to supportive evidence. (*Id.* at ECF pp. 3–7.)

For the reasons discussed *infra*, the Court recommends finding that this is not a case "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008). Accordingly, no genuine dispute of material fact exists, and the Court respectfully recommends granting Defendants' motion for summary judgment.

## A. Excessive Force

Defendants argue that they are entitled to summary judgment on Plaintiff's excessive force claim because Plaintiff has "fabricated" his claim, providing no evidence to support the claim other than his own self-serving allegations. (Defs. Mem., ECF No. 213, at 8.) Having carefully reviewed the summary judgment record, and drawing all reasonable inferences in Plaintiff's favor, the Court respectfully recommends granting summary judgment for Defendants on Plaintiff's excessive force claim.

1.  *Legal Standard*

The Fourth Amendment guarantees the right of all people to "to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. When a plaintiff raises excessive force claims related to an arrest, those claims "are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989); *see also Singer v. Fulton County Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" constitutes excessive force. *Graham*, 490 U.S. at 396 (quotation marks omitted). However, it is "well established" that "the use of entirely gratuitous force is unreasonable and therefore excessive." *Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010).

To assess an excessive force claim, the Court considers four factors: (1) "the need for the application of force," (2) "the relationship between the need and the amount of force that was used," (3) "the extent of injury inflicted," and (4) "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 251–52 (2d Cir. 2001) (quotation marks omitted).

Assaulting someone who is handcuffed and subdued is routinely recognized as excessive force. *See Ostroski v. Town of Southold*, 443 F. Supp. 2d 325, 342 (E.D.N.Y. 2006) (collecting cases). Pushing a handcuffed person into an object face-first and causing that person to strike their head, without provocation, may also constitute excessive force. *See Maxwell*, 380 F.3d at 108 (allowing an excessive force claim based on allegations that officers "violently shoved [the plaintiff] head first into [a] police car . . . caus[ing the plaintiff's] head to strike the solid partition inside of the police car" to survive summary judgment). In contrast, gripping somebody during the course of an arrest, without

more, does not support a claim of excessive force. *See Figueroa v. Mazza*, 825 F.3d 89, 105–06 (2d Cir. 2016) (denying excessive force claim based on the plaintiff's claim that officers gripped his shoulder and pushed him during the course of an arrest).

If a plaintiff provides no evidence other than his inconsistent testimony that an assault occurred, especially if the medical records provide evidence of an alternative cause of the injury in question, the excessive force claim may fail. *Cf. Henry v. Brown*, 406 F. Supp. 3d 211, 215 (E.D.N.Y. 2016) (granting summary judgment because multiple medical records and police observation indicated that any pain the plaintiff was in was likely exclusively due to self-inflicted injuries).

 2. *Analysis*

Plaintiff claims there are three material factual disputes related to this assault. First, he argues that Defendants have not supported their claim that this assault did not take place. Second, he argues that the body camera footage does not capture the full incident, and that the officers should have activated their body cameras earlier. Third, he argues that evidence of inconsistent statements regarding the arresting officer in the case supports his excessive force claim.

Defendants argue that, other than Plaintiff's self-serving statements, no evidence in the summary judgment record indicates that the alleged assault occurred. Before analyzing this claim, the Court notes that some significant factual issues related to this assault are not in dispute.

First, there is no dispute that the bodega workers injured Plaintiff. (*See* SAC, ECF No. 69, at ECF p. 10 ("I was basically jumped by officer menendez and this female after being attacked and sustaining injuries to my head by store clerks with bats and sticks."); Defs. 56.1, ECF No. 211-1, ¶ 19 (quoting Menendez BWC 2, ECF No. 211-6, at 10:30–11:10) (describing how the workers hit him with a bat and wooden sticks and "'[b]usted

38

my shit open. Now I gotta get stitches'"); *see also* Defs. 56.1, ECF No. 212, ¶¶ 15–16 (noting that Plaintiff responded to Officer Menendez's statement that Plaintiff was bleeding when the officer showed up by stating the bodega clerks hit him).) Other than his own claims, which are inconsistent with each other as discussed below, Plaintiff has not identified what evidence would support a finding that Menendez caused Plaintiff's injuries or that his injuries resulted from an excessive use of force by the police.

Second, Plaintiff's statements on video do not provide evidence of Menendez's alleged attack. (*See, e.g.*, Defs. 56.1, ECF No. 212, ¶ 19; *see generally* Menendez BWC 1, ECF No. 211-5; Menendez BWC 2, ECF No. 211-6; *see also* Pl. 56.1, ECF No. 206, ¶ 19 (stating that Plaintiff "intentionally omitted certain facts of the incident . . . in order for him to feel safe while being in an ambulance with the officer that attacked him").) Rather, as discussed below, Plaintiff's contemporaneous statements on the night of the incident are in stark tension with his current claims.

Third, Plaintiff concedes that the record lacks evidence to prove that a woman attacked him, which he alleges was happening *while Menendez was assaulting him*. (*See* SAC, ECF No. 69, at ECF p. 10; Pl. Decl. in Opp'n, ECF No. 208, ¶ 5; Pl. Opp'n, ECF No. 207, at ECF pp. 6–7 ("plaintiff was not able to orchestrate to arrange the female that attacked the plaintiff while being held down to offer evidence in the case"); Defs. 56.1, ECF No. 212, ¶¶ 20–23; *see also* Bodega Footage, ECF No. 211-1 (showing a woman trying to grab the stick one bodega worker was using to hit Plaintiff); Menendez BWC 1 & 2, ECF Nos. 211-5 & 211-6 (lacking footage of woman attacking Plaintiff or any statements by Plaintiff indicating that a woman attacked him).)

a. <u>Plaintiff's Sworn and Recorded Statements</u>

As noted above, Plaintiff's sworn declaration submitted in opposition to this motion asserts that, while he was handcuffed, Menendez attacked him, shoving his face

into a metal bench, while a woman simultaneously attacked him. (Pl. Decl. in Opp'n, ECF No. 208, ¶¶ 4–6.) He alleges that Menendez only stopped when Plaintiff told him he would be "penalized." (*Id.* ¶ 5.) Finally, Plaintiff alleges that Caviness waited until after Menendez stopped assaulting Plaintiff to tell the officers to turn on their body cameras. (*Id.* ¶ 7.) He claims that he downplayed the incident in statements afterwards to avoid being subjected to violence while in custody. (*Id.* ¶¶ 9–10.)[27]

The vast majority of Plaintiff's statements on the day of the incident indicate that Plaintiff's injuries were caused by the bodega workers, who hit him with a bat in the course of the fight. Moreover, on camera and in the medical records, Plaintiff's statements never suggest the specific factual allegations now claimed in this case: that a woman attacked him that night and that Menendez scraped Plaintiff's face on a metal bench during that assault. (*See* Menendez BWC 1, ECF No. 211-5; Menendez BWC 2, ECF No. 211-6; *see* SAC, ECF No. 69, at ECF pp. 6–10; *see also* Medical Records, ECF Nos. 211-7, 209-3 (sealed version).)

Tellingly, in the body camera footage included in the record, Plaintiff does mention an assault by Menendez in the course of a threat to sue, but not as a description of the events of the night. (*See* Defs. 56.1, ECF No. 212, ¶ 8 (citing Menendez BWC 1, ECF No. 211-5, at 01:24–2:10) (asking "how much you goin' to pay me? . . . Do you want to be part of a civil lawsuit, Boy?"); Pl. 56.1, ECF No. 206, ¶ 8 (agreeing that this occurred as stated).) Plaintiff stated, on camera: "I got beat up. I could've blamed this all

---

[27] As a threshold matter, the Court notes that Plaintiff's statements in the briefing itself cannot raise a dispute of fact. *See* Fed. R. Civ. P. 56(c) (noting that, to raise a dispute of fact, a party must support their assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials").

on you . . . Thankfully y'all got body cameras." (Menendez BWC 1, ECF No. 211-5, at 8:02–8:12.) Plaintiff also tells Menendez he can bring a lawsuit against Menendez because "I'm bleeding and you touching me." (*Id.* at 3:10–3:15.)[28] In addition, as set forth above, while in the ambulance, Plaintiff mused about what lawsuit he could bring against the bodega workers. In other words, the body camera footage illustrates that on the night of the incident, remarkably, Plaintiff was already attempting to workshop claims for future lawsuits in real time, not that he had experienced violence a short time ago at the hands of a New York City police officer.[29]

In addition, as set forth above, when Menendez stated that he arrived after Plaintiff was handcuffed and did not know what had occurred prior to his arrival, Plaintiff responded by explaining what happened. As detailed above, when Menendez said, "I don't even know what they're doing with this. You hear me? Like I showed up, you were already in handcuffs, you were bleeding, I had no idea what was going on,"

---

[28] Over the course of a few minutes, Plaintiff's recorded statements contradict themselves. (*Compare* Defs. 56.1, ECF No. 212, ¶ 7 (citing Menendez BWC 1, ECF No. 211-5, at 00:58–1:12) (describing how he got hit with a bat by bodega employees), *with id.* ¶ 9 (citing Menendez BWC 1, ECF No. 211-5, at 02:28–3:15) (denying he said he got hit with a bat, saying Menendez beat him up, and referencing a potential lawsuit).) This pattern continues throughout the record and within Plaintiff's filings. (*See, e.g.*, Pl. Dep., ECF No. 211-2, at 38:9–10 (stating that the bodega employee "hit [him] for no reason"); *id.* at 41:1–10 (describing how he started smashing merchandise in the bodega before the fight took place).)

[29] The Court is cognizant of the fact that the video footage in the record, which unfortunately did not capture Menendez's activities from the moment he left his patrol car, does not definitively preclude the possibility that an assault occurred. However, taking the summary judgment record as a whole, the bodycam footage supports Defendants' version of events as established through the voluminous deposition testimony. Further, as set forth above, the moment Menendez grabbed Plaintiff by the arm, he began clearly, loudly, and repeatedly objecting to non-violent contact with Menendez. (Menendez BWC 1, ECF No. 211-5, at 1:10–1:45.) He also began rattling off docket numbers for his own pending civil rights suits. (*Id.*) These actions by Plaintiff are entirely inconsistent with his claim that Menendez had, just moments before, engaged in an extraordinarily violent group assault that involved scraping Plaintiff's face against a metal bench.

Plaintiff responded with a detailed account of what happened in the store and with Chantel that night. (Menendez BWC 2, ECF No. 211-6, at 1:54–2:30.) The video evidence of Plaintiff describing what happened that night and telling Menendez about the woman's role, as though Menendez was not there to witness the events and did not know that this event involved a woman, seriously undercuts Plaintiff's newer claims that Menendez and the woman who was present jointly beat Plaintiff up immediately after he was handcuffed. (*Compare* Menendez BWC 2, ECF No. 211-6, at 1:59–2:30, *with* SAC, ECF No. 69, at ECF pp. 6–10.)

As set forth above, Plaintiff's complaint states that while he was handcuffed, a "female was actively punching the Plaintiff in his face," at which point he "was basically jumped" by Officer Menendez, who shoved his face into a bench and held "the plaintiff down so he can be further attacked by the hostile female." (SAC, ECF No. 69, at ECF pp. 8–10.) In his pleadings, the two assaults were intertwined. (*See id.*) As discussed above, however, the video footage of the assault in the bodega and Plaintiff's statements on camera indicate that the only woman present for the fight was trying to *stop* Plaintiff from being hit by the bodega workers. (Bodega Footage, ECF No. 211-1; Menendez BWC 2, ECF No. 211-6, at 12:43–13:24.)

Furthermore, Plaintiff's descriptions of the incident to EMTs and medical care providers on the night of the incident do not support Plaintiff's current account. As detailed above, when the EMTs arrived on scene, Plaintiff first provided yet another version of the story, which was retracted within seconds on video — suggesting that Menendez *and officers in the store* hit Plaintiff — with the following statement: "Officer Menendez and the officers in the store hit me. Matter of fact, you know what Menendez, you good.'" (Defs. 56.1, ECF No. 212, ¶ 11 (citing Menendez BWC 1, ECF No. 211-5, at 4:30–4:50).) And right after that, when an EMT asked Plaintiff: "What

42

happened tonight?," Plaintiff stated: "I went in the store, they robbed me for my bag, and then when I asked them for my bag, they started hitting me with a bat." (*Id.* ¶ 12 (citing Menendez BWC 1, ECF No. 211-5, at 4:35–5:20); Menendez BWC 1, ECF No. 211-5, at 4:58–5:07.) The second version of the events Plaintiff provided to the EMTs is, notably, entirely consistent with the account of the evening that Plaintiff provided to Menendez while they were riding in the ambulance. (Menendez BWC 2, ECF No. 211-6, at 1:59–2:30; *see also generally* Medical Records, ECF Nos. 211-7, 209-3 (sealed version).) Other than Plaintiff's statements made after this incident, there is no evidence in the record to support Plaintiff's current version of the events, i.e., his claim that Officer Menendez and the "hostile female attacked the plaintiff." (Pl. Decl. in Opp'n, ECF No. 208, ¶ 5.)

Having reviewed the record in the light most favorable toward the non-movant, the Court finds that Plaintiff's statements to medical personnel on the night of the incident and his contemporaneous statements on video contradict his claims in this case and his own statements later made in support of this motion. Under the unique factual circumstances here, where Plaintiff made various statements to multiple parties on the night of the underlying events, some of which were recorded on video, and all of which are inconsistent with later-crafted conclusory allegations that are unsupported by any other evidence, the Court finds that Plaintiff's self-serving statements about the incident do not create a dispute of material fact. *See Bentley*, 935 F.3d at 86; *Aziz Zarif Shabazz*, 994 F. Supp. at 470.[30]

---

[30] The Court also notes that a review of Plaintiff's documentary submission, read in the light most favorable to Plaintiff, does not reveal any evidence that Officer Menendez, or any other officer, assaulted Plaintiff at any point during the course of the night. (*See generally* Pl. Record, ECF No. 218; Pl. Add'l Contentions, ECF No. 221.)

b.   Contradictory Evidence of Arresting Officer's Identity

Plaintiff also argues that Defendants cannot demonstrate which officer arrested him, which he argues creates a dispute of material fact. The Court finds that the evidence as to who arrested Plaintiff does not show a genuine issue in dispute. As discussed at length above, taken together, the video evidence and officers' deposition testimony show that Officer Smith, who was assigned to the PSA, placed Plaintiff in handcuffs and that Officer Jean-Baptiste of the 81st Precinct handled the arrest processing.

However, even assuming that there is a genuine dispute about who placed Plaintiff in handcuffs, that does not demonstrate that Officer Menendez assaulted Plaintiff after he was handcuffed. As Defendants point out, the arresting officer's identity is ultimately irrelevant to determining whether Menendez assaulted Plaintiff. (Letter, ECF No. 220, at 2.) This is especially true because Plaintiff alleges that he was handcuffed prior to Menendez's alleged attack. (SAC, ECF No. 69, at ECF p. 10.) Accordingly, the Court finds that the questions raised as to who served as the arresting officer are (a) answered by the record; and (b) do not preclude summary judgment.

c.   Defendants' Lack of Evidence & Lack of Complete Body Camera Footage

Finally, Plaintiff repeatedly argues that Defendants have failed to provide evidence to support their version of events. (*See, e.g.*, Pl. Opp'n, ECF No. 207, at ECF p. 2 (arguing that the City "has no credible evidence in this matter to offer in regards to what occurred during the event").) In keeping with this argument, Plaintiff notes that officers who should have turned on their body cameras did not do so. (*Id.* at ECF p. 1.) Plaintiff argues that this lack of evidence "suggest[s] that the plaintiff's account of the incident is more plausible" than Defendants' version. (*Id.* at ECF p. 2.) Plaintiff also argues that "it can only be said that the plaintiff fabricated the events, if there was

44

actual video to disprove that the plaintiff was actually assaulted (which there is not)." (*Id.* at ECF p. 6.)

As detailed above, though, Defendants' version of events is supported by a Rule 56.1 statement that includes record citations that support their factual contentions. (*See* Defs. 56.1, ECF No. 212.) To survive summary judgment, then, Plaintiff must advance sufficient "evidence . . . such that a reasonable jury could return a verdict for" him. *Nick's Garage, Inc.*, 875 F.3d at 113 (quotation marks omitted). The burden is not on Defendants to disprove unsupported allegations. *See Anderson*, 477 U.S. at 252; *Jeffreys*, 426 F.3d at 554 (observing that the non-moving party "'must offer some hard evidence showing that [his] version of the events is not wholly fanciful'" (quoting *D'Amico*, 132 F.3d at 149)); *see also* Fed. R. Civ. P. 56.

The Court's review of the record indicates that Plaintiff has failed to "'come forward with specific facts showing that there is a genuine issue for trial.'" *Brizzi*, 529 F. Supp. 3d at 51 (emphasis omitted) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). Having reviewed the record as a whole, including the video and documentary evidence from the incident and its immediate aftermath, as well as Plaintiff's statements on video, the Court finds that all of the evidence in the summary judgment record is consistent with the police officers' sworn testimony regarding the events in this case — except Plaintiff's statements made long after the incident. To be clear, the *only* evidence that supports Plaintiff's claim that he was beaten by an officer and a hostile woman is his own testimony, which is contradicted by all of the other evidence in the summary judgment record and his own contemporaneous statements on the night he was arrested (which statements were also inconsistent on the night of the incident).

Accordingly, this is another case where there is "'nothing in the record to support [Lurch's] allegations other than [Lurch's] own contradictory and incomplete

testimony,' which does not give rise to a dispute as to a material fact." *Lurch v. Chaput*, No. 16-CV-2517 (AT), 2022 WL 889259, at *9 (S.D.N.Y. Mar. 25, 2022) (quoting *Jeffreys*, 426 F.3d at 554–55) (modifications in original), *aff'd*, 2023 WL 2469943 (2d Cir. Mar. 13, 2023). Plaintiff, who, as Defendants point out, is a prolific litigant, should be well aware of the summary judgment standard based on courts' prior rulings in his other cases. (Reply, ECF No. 215, at 2 (asserting that "plaintiff has brought nearly thirty lawsuits in the Eastern and Southern Districts of New York alone").) Plaintiff has not met his burden in this case.

To be clear, this is not a situation in which a plaintiff is exclusively relying on their own statements, under oath and otherwise, to illustrate a fact in dispute but merely lacks corroboration. The Court is cognizant that "[t]here is nothing in [Federal Rule of Civil Procedure 56(c)] to suggest that nonmovants' affidavits alone cannot — as a matter of law — suffice to defend against a motion for summary judgment." *Knox*, 134 F.4th at 49 (quotation marks omitted). Here, the Court does not summarily discount Plaintiff's statements because they are self-serving or because they lack corroboration. Rather, in the face of all of the evidence in the summary judgment record, which, taken together, shows that Menendez was not present when Lurch was injured by the bodega workers and placed in handcuffs, and that Menendez did not interact with a woman who was at the scene that night, Plaintiff offers only his own post-hoc testimony, "which is contradictory and incomplete." *Jeffreys*, 426 F.3d at 554. That is not enough. Because Plaintiff has failed to adduce any evidence on summary judgment other than his own sworn statements, which are heavily contradicted by the entire summary judgment record, including Plaintiff's own statements to the EMTs and other medical personnel and his contemporaneously recorded statements, the Court finds that Plaintiff has not placed a material fact in dispute and that no reasonable jury could find

for Plaintiff as to his excessive force claim against Officer Menendez. Accordingly, the Court recommends granting summary judgment on this claim.

### B. Failure to Protect

Plaintiff also claims that all the officers failed to protect him from the female civilian's attack, in violation of the Due Process Clause of the Fourteenth Amendment. (SAC, ECF No. 69, at ECF pp. 6–9.)[31] Defendants argue that this claim fails as a matter of law because Plaintiff has not established that he was attacked by a female civilian, the available evidence indicates that no such attack occurred, and Plaintiff cannot establish the requisite level of involvement of any of the officers. (Defs. Mem., ECF No. 213, at 13–15.) For the following reasons, the Court recommends granting summary judgment for Defendants on the failure to protect claim.

#### 1. *Legal Standard*

In limited circumstances, "the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 198 (1989). It is well established that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199–200. To establish that an officer failed to protect him while in custody, a plaintiff "must show that the officers' behavior was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary

---

[31] Plaintiff also includes Officer Menendez's alleged assault in his failure to protect allegations. (*See* SAC, ECF No. 69, at ECF pp. 7–8.) In light of the Court's finding that Plaintiff has failed to adduce sufficient evidence from which a reasonable jury could find that this assault occurred, the Court recommends finding that Plaintiff has also failed to establish that any officer failed to protect Plaintiff from the alleged attack by Menendez.

conscience.'" *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998)). The claimant must also demonstrate that each officer's "own individual actions" violated the Constitution. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

      2.  *Analysis*

As noted above, Plaintiff alleges that all named officers failed to protect him from a "hostile female" who allegedly attacked him while he was handcuffed. (SAC, ECF No. 69, at ECF pp. 6–8.) Plaintiff alleges that "the female assaulted the Plaintiff with [a] closed fist." (*Id.* at ECF pp. 7–8.) Plaintiff also alleges that Officers David Smith, Mikola Maharskyy, Vincent Pira, Xavier Galloza, Jonathan McGibbon, Karl Hanisch, and Sergeant Treymane Craigg allegedly "sat and watched the incident like it was a movie." (*Id.* at ECF p. 8.)

Defendants argue that based on the body camera footage, Plaintiff cannot establish that a woman attacked him, given that no assault is depicted and that Plaintiff does not at any point mention such an attack while describing the events of the night. (Defs. Mem., ECF No. 213, at 13–15.) Defendants also note that, in light of how Plaintiff has pleaded his claims, Plaintiff must adduce evidence to establish that the woman assaulted him *while* Menendez was also holding him down and assaulting him. (*Id.* at 14.) Finally, Defendants argue that the failure to protect claim against the remaining officers fails because none of the allegations are specific to or claim personal involvement of each individual officer. (*Id.* at 15.)

As discussed above, Defendants argue, and Plaintiff concedes, that other than Plaintiffs' statements, the record lacks evidence of a woman attacking him on the night of the incident. (Defs. 56.1, ECF No. 212, ¶¶ 20–23; *see* Pl. Opp'n, ECF No. 207, at ECF pp. 6–7 ("plaintiff was not able to orchestrate to arrange the female that attacked the

plaintiff while being held down to offer evidence in the case").) The Court's independent review of Plaintiff's evidentiary filings and the footage from the incident reveals no indication that such an attack occurred, either through direct footage of the incident or in Plaintiff's numerous descriptions of the incident in its aftermath. (*See, e.g.*, Menendez BWC 1, ECF No. 211-5 (lacking footage of woman attacking Plaintiff or statements by Plaintiff indicating that such an attack occurred); Menendez BWC 2, ECF No. 211-6 (including in description of events that a woman told the people hitting him to stop).) Rather, it appears that the woman involved in the incident was trying to protect Plaintiff in advance of the arrest. (*See* Bodega Footage, ECF No. 211-1 (showing a woman attempting to grab the stick a bodega worker was using to hit Plaintiff); Menendez BWC 2, ECF No. 211-6, at 12:43–13:24 (including Plaintiff's description of the woman's attempt to stop the beating).)

Plaintiff's allegations in the complaint also lack the specificity required to state a failure to protect claim against each Defendant. Aside from alleging their presence, none of Plaintiff's allegations specify what Craigg, Smith, Maharskyy, Pira, Galloza, McGibbon, or Hanisch were doing on the night of the incident. (*See* SAC, ECF No. 69, at ECF p. 7 ("7 other state actors sat and watched the incident like it was a movie").) In Plaintiff's filings in opposition to summary judgment, Plaintiff alleges that "[a]ll of the officers listed as defendants were at least 50 feet or closer . . . and had ample time to intervene verbally or physically to prevent the Plaintiff from being injured even further by their partner's actions." (Pl. Opp'n, ECF No. 207, at ECF p. 6.) He has not, however, adduced any evidence that these officers actually saw a woman attack Plaintiff, and the Court notes that the police personnel's uncontroverted deposition testimony establishes that the officers arrived at somewhat different times and had different vantage points; indeed, Lieutenant David Smith did not even arrive on scene until over an hour after

Plaintiff was taken to the hospital. (*See also id.* at 5 ("Maharskyy, his partner and David smith were not handling the arrest in front of the convenience store (they were discussing something on the side of the store) however, they were close enough to see the plaintiff being attacked and had over 20 seconds after the plaintiff was first hit . . . to respond").)

Once again, Plaintiff's conclusory allegations that all of these officers witnessed a woman attack him and failed to protect him are contradicted by contemporaneously recorded statements, as discussed above. (*See also* Defs. 56.1, ECF No. 212, ¶¶ 20–21 (citing Medical Records, ECF Nos. 211-7, 209-3 (sealed version)) (indicating that Plaintiff told hospital intake staff, a social worker, and a doctor that he was injured because he was beaten with a bat in a bodega, without mentioning an assault by a woman or a police officer).) Although the Bodega Footage does show a woman who appears to be with Plaintiff on the night of these events, she appears to be trying to protect him during the fight in the bodega, as discussed above. (*See* Bodega Footage, ECF No. 211-1 (showing a woman trying to grab the stick one bodega worker was using to hit Plaintiff).) However, there is no evidence in the record that a woman attacked Plaintiff other than his own self-serving and heavily contradicted statements. (*See* SAC, ECF No. 69, at ECF pp. 6–10; Pl. Decl. in Opp'n, ECF No. 208, ¶ 5; Pl. Add'l Contentions, ECF No. 221, at ECF pp. 6–7; Defs. 56.1, ECF No. 212, ¶¶ 20–23; *see generally* Menendez BWC 1 & 2, ECF Nos. 211-5 & 211-6.)

Since Plaintiff has failed to adduce any evidence other than his own heavily contradicted statements that a woman attacked him in the early morning hours of August 17, 2019, and he has failed to identify how each officer's conduct violated their duty to protect him from harm, the Court recommends granting summary judgment for Defendants as to Plaintiff's failure to protect claim.

C. **Failure to Intervene**

Plaintiff also brings claims alleging that Craigg, Smith, Maharskyy, Pira, Galloza, McGibbon, and Hanisch failed to intervene to prevent Menendez from assaulting Plaintiff. (SAC, ECF No. 69, at ECF pp. 8–9.) Defendants argue that Plaintiff's claim must fail as a matter of law because Plaintiff has not established an underlying constitutional violation.

1. *Legal Standard*

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that excessive force is being used." *Id*. To be liable, each officer must have had a "realistic opportunity to intervene to prevent the harm from occurring." *Id*. Officers who were present during a constitutional violation and who had an opportunity to respond are typically not entitled to summary judgment. *See Jackson v. City of New York*, 939 F. Supp. 2d 235, 258 (E.D.N.Y. 2013); *Hepburn v. City of New York*, No. 21-CV-04158 (OEM) (VMS), 2025 WL 1640205, at *15–16 (E.D.N.Y. June 10, 2025).

2. *Analysis*

As discussed above, Plaintiff has not adduced sufficient evidence for a reasonable jury to conclude that Menendez attacked Plaintiff or that Menendez facilitated an attack by Chantel. Further, as discussed above, Plaintiff has made no particularized allegations indicating that the responding officers saw, or failed to intervene in, any assault outside the bodega. In fact, the Court notes that at least one of the Defendants Plaintiff alleges failed to protect him during the alleged attack arrived

well after Plaintiff was taken to the hospital. (*See* David Smith Dep., ECF No. 218, at ECF p. 217, 30:18–32:25 (stating that earlier in the night, he responded to an incident elsewhere involving a stabbing, and that he arrived at the scene of Lurch's arrest between 3:00 a.m. and 4:00 a.m.).)

Plaintiff has failed to "do more than simply show that there is some metaphysical doubt as to the material facts" about who saw what and when. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586 (1986). Since no reasonable jury could conclude that there was an underlying "infringement by other law enforcement officers in [the Defendant officers'] presence," the Court recommends granting summary judgment for Defendants on Plaintiff's failure to intervene claim. *Anderson*, 17 F.3d at 557.

## CONCLUSION

For all the reasons discussed herein, the allegations in this case fall into the same category of claims as those rejected by then-Judge Sonia Sotomayor in *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 468–71 (S.D.N.Y. 1998). In that case, she observed: "[W]hen the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court is] authorized to 'pierce the veil of the complaint's factual allegations,' dispose of '[s]ome improbable allegations', and dismiss the claim." *Id.* at 470 (quoting *Denton v. Hernandez*, 504 U.S. 25, 32, 33 (1992)). Here, the Court finds that "no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in the complaint," which renders summary judgment appropriate. *Jeffreys,* 426 F.3d at 555 (modifications and quotation marks omitted). Accordingly, the Court respectfully recommends that Defendants' motion for summary judgment (ECF No. 210) be granted in full.

\*    \*    \*    \*    \*

This report and recommendation will be filed electronically. As a courtesy, the Court also respectfully directs Defendants to provide a copy of this report and recommendation to Plaintiff forthwith and to file proof of same by August 5, 2025. Objections to this report and recommendation must be filed, with a courtesy copy sent to the Honorable Diane Gujarati at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen (14) days of filing. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal both before the district court and appellate courts. *See, e.g.*, *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision" (quotation marks omitted)).

**SO ORDERED.**

Dated: Brooklyn, New York
August 1, 2025

_____
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE